UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
In re:

       BROADWALL AMERICA, INC.,              Chapter 11
                                          Case No. 04-13810 (JMP)

                 Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
In re:
                                          Chapter 11
       BRAM WILL EL LLC,                   Case No. 05-10616 (JMP)

                 Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
In re:
                                          Chapter 11
       WILLIAM MUSCHEL, LLC,           Case No. 05-10617 (JMP)

                 Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
BROADWALL AMERICA, INC.,

                 Plaintiff,


            -against-                 Adv. Pro. No. 06-01788 (JMP)
                                        Adv. Pro. No. 06-01789 (JMP)
BRAM WILL EL LLC, and               Adv. Pro. No. 06-01790 (JMP)
WILLIAM MUSCHEL, LLC,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## NOTICE OFJOINT MOTION FOR APPROVAL OF A PROPOSED STIPULATION AND ORDER PURSUANT TO RULE 9019(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND SECTION 105(a) OF THE BANKRUPTCY CODE


           PLEASE TAKE NOTICE, that a hearing will be held before the Honorable James M. Peck at the United States Bankruptcy Court, One Bowling Green, New York, New York 10004-1408, on the 19.ᵗʰ day of October, 2010 at 10:00 a.m. to consider the motion of Broadwall America, Inc. ("Broadwall"), the plaintiff in the three above-captioned consolidated

adversary proceedings (the "Adversary Proceedings"), and each of Bram Will El LLC ("Bram Will") and William Muschel, LLC ("W. Muschel, LLC") (together, the "Defendants"), defendants in the Adversary Proceedings for entry of an order, pursuant to 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Federal Rules"), approving the compromise set forth in the proposed Stipulation and Order attached hereto as "Exhibit 1" (the "Settlement") and for related relief.

PLEASE TAKE FURTHER NOTICE, that objections, if any, shall be in writing, served upon the undersigned, and filed with the Clerk of Court, with a courtesy copy to Judge Peck's chambers, at least three days prior to the hearing date.

Dated: Uniondale, New York
      September 20th, 2010

WESTERMAN BALL EDERER MILLER & SHARFSTEIN, LLP

By: _/s/_____
      Thomas A. Draghi, Esq.
      170 Old Country Road, Suite 400
      Mineola, New York 11501
      (516) 622-9200
      *Attorneys for Broadwall America, Inc., Reorganized Debtor*

Dated: New York, New York
      September 20th , 2010

BACKENROTH FRANKEL & KRINSKY LLP

By: __/s/_____
      Abraham Backenroth, Esq.
      489 Fifth Avenue
      New York, New York 10017
      *Attorneys for Bram Will El, LLC and William Muschel, LLC, Debtors*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
In re:

      BROADWALL AMERICA, INC.,         Chapter 11
                                         Case No. 04-13810 (JMP)

                Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
In re:
                                         Chapter 11
      BRAM WILL EL LLC,              Case No. 05-10616 (JMP)

                Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
In re:

                                         Chapter 11
      WILLIAM MUSCHEL, LLC,         Case No. 05-10617 (JMP)

                Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
BROADWALL AMERICA, INC.,

                Plaintiff,


           -against-              Adv. Pro. No. 06-01788 (JMP)
                                         Adv. Pro. No. 06-01789 (JMP)
BRAM WILL EL LLC, and           Adv. Pro. No. 06-01790 (JMP)
WILLIAM MUSCHEL, LLC,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## JOINT MOTION FOR APPROVAL OF A PROPOSED STIPULATION AND ORDER PURSUANT TO RULE 9019(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND SECTION 105(a) OF THE BANKRUPTCY CODE

     Broadwall America, Inc. ("Broadwall"), the plaintiff in the three above-captioned

consolidated adversary proceedings (the "Adversary Proceedings"), and each of Bram Will El

LLC ("Bram Will") and William Muschel, LLC ("W. Muschel, LLC") (together, the

"Defendants"), defendants in the Adversary Proceedings, by their undersigned attorneys, in support of the parties' joint motion for entry of an order pursuant to 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Federal Rules") approving the compromise set forth in the proposed Stipulation and Order attached hereto as "Exhibit 1" (the "Settlement") and for related relief, state as follows:[1]

## Preliminary Statement

1.     After years of contentious litigation in State Court and before this Court, the parties are pleased to present to this Court a proposed amicable resolution to the various disputes. The matter, which was also the subject of a family related Rabbinical Arbitration, has been finally resolved, subject to this Court's approval, pursuant to a settlement whereby the "Properties," as hereinafter defined and which are the subject of the dispute, will be sold for $11 million dollars, all cash, in "as is" condition, and not subject to a certificate of occupancy which the Properties do not have, in accordance with the terms of the Contract of Sale (defined below). As set forth more fully below, the settlement resolves the underlying disputes as to the Properties which are at the heart of the parties' disputes; results in dismissal and/or closure as applicable, of the three pending bankruptcy cases of each of Broadwall, Bram Will, and Muschel LLC; and results in the dismissal and resolution of the pending adversary proceedings. The Properties have no mortgages or other liens and, therefore, to the extent there are undisputed claims outstanding in either the Bram Will or Muschel LLC cases,[2] they will be satisfied out of the sale proceeds,

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Settlement attached as "Exhibit 1" hereto.
[2] As discussed more fully below, Broadwall previously confirmed and substantially consummated its Plan (defined below) by making full distributions, with interest, to holders of allowed claims and allowed equity interests under the

2

and to the extent there are any disputed claims which are not resolved beforehand, they can be determined in the ordinary course in State Court with the all the rights and defenses of the parties reserved. Consequently, no creditors' claims are compromised as a result of the resolution of these disputes and the parties submit that approval of the Settlement is in the best interests of all constituents.

## Background

### The Bankruptcy Cases

2.      On June 2, 2004 (the "Broadwall Petition Date"), Broadwall filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Broadwall Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). Prior to the Broadwall Petition Date, Broadwall, as purchaser, and the Defendants entered into a real estate contract of sale dated August 7, 2002 (the "Contract") involving two properties located at 734 and 736 Broadway in Manhattan, New York (the "Properties").

3.      On January 20, 2005, the Bankruptcy Court entered an order (the "Confirmation Order") confirming Broadwall's First Amended Chapter 11 Plan of Reorganization (the "Plan") and the Plan became effective. On January 31, 2005, Broadwall made full distributions, with interest, to holders of allowed claims and allowed equity interests under the Plan, and otherwise substantially consummated its Plan. At this point, Broadwall has no creditors and its only shareholder is Gary Barnett, the principal of Broadwall ("Barnett").

4.      On February 3, 2005, each of the Defendants filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (together, the "Defendants' Bankruptcy Cases") in the Bankruptcy Court. Defendants continue to operate their businesses and manage their properties

---

Plan. Accordingly, Broadwall no longer has any creditors.

as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, and no committee of unsecured creditors has been appointed in either of the Defendants' Bankruptcy Cases.

5.　　On or about June 11, 2010, Bram Will and Muschel LLC each filed a motion seeking to dismiss their respective bankruptcy case, which motions are currently pending before this Court.

**The State Court Action and the Adversary Proceedings**

6.　　In accordance with a certain of a decision and order of the Honorable Cornelius Blackshear, dated March 23, 2005 ("March 23, 2005 Decision"), Broadwall and the Defendants were referred back to an already pending action in the Supreme Court of the State of New York, County of New York entitled *Broadwall America, Inc. v. Bram Will El LLC and William Muschel, LLC,* No. 603383/02 (the "State Court Action") for the purpose of litigating certain issues with respect to the rights of the parties under the Contract. On November 23, 2005, the State Court issued a decision in the State Court Action (the "Summary Judgment Decision") and granted summary judgment in favor of Broadwall and issued judgment directing the Defendants to close under the Contract.

7.　　Thereafter, the Defendants bonded the judgment and on December 20, 2005, the Defendants appealed the Summary Judgment Decision to the First Appellate Division. In a decision dated September 21, 2006 (the "State Appellate Decision"), the First Department reversed the State Court's Summary Judgment Decision and determined that Plaintiff had no right to compel a closing under the Contract. On or about October 10, 2006, Broadwall commenced the Adversary Proceedings seeking declaratory and injunctive relief asserting that

the First Department exceeded its mandate under March 23, 2005 Decision in issuing the State Appellate Decision. On May 18, 2007, the Defendants filed an amended answer in the Adversary Proceedings.

**The Proposed Settlement**

8.    Following arm's length and good faith negotiations, and after taking into consideration, as a practical matter, the present value of the Properties based upon present economic conditions of the real estate market, and to avoid the further expenditure of time, effort and money, and the inconvenience incident to further litigating the Adversary Proceedings, and without any determination of the validity or invalidity of the parties' claims and defenses, the parties desire fully and finally to compromise, settle and resolve the disputes between and amongst them on the terms set forth in the Settlement.

9.    Among other provisions, the Settlement provides that (a) notwithstanding anything contained in the Confirmation Order or Plan to the contrary, Broadwall will waive the rights and/or claims it has or may have to acquire the Properties under the Contract, including, without limitation, any right to compel a sale or closing of the Properties under the Contract; (b) Broadwall and the Defendants otherwise fully reserve all other rights, claims or defenses that they have against each other arising under or otherwise related to the Contract, including but not limited to claims specifically against the former principals of Broadwall, the broker under the Contract, Extreme Realty LLC and others, which are the subject of a separate action in State Court entitled Bram Wil-El LLC, et. al v. Extreme Realty, LLC, et. al; case number 12667/07, Supreme Court of the State of New York, Kings County ("State Supreme Kings Action") (c) each of the Defendants' Bankruptcy Cases will be dismissed; (d) and the Defendants will sell the

Properties to Barnett, or his designee (including Extell Development Company), for $11 million dollars, as is, not subject to obtaining a certificate of occupancy. A Copy of the contract of sale is annexed hereto as "Exhibit 2" (the "Contract of Sale").

## Jurisdiction and Venue

10.     This Court has jurisdiction pursuant to 28 U.S.C. §§157(a) and 1334. Venue is proper pursuant to 28 U.S.C. §1408. This is a core proceeding pursuant to 28 U.S.C. §§157(b). The statutory predicates are Bankruptcy Code section 105(a) and Rule 9019 of the Federal Rules.

## Relief Requested

11.     Rule 9019(a) of the Federal Rules provides as follows:

> (a) *Compromise*. On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. Pro. 9019(a) (Matthew Bender & Co. 2008).

12.     In approving the compromise and settlement, the Bankruptcy Court is required to make an "informed and independent judgment" as to whether the compromise and settlement is fair and equitable based on an:

> educated estimate of the complexity, expense and likely duration of [any] litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process, in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-425, *reh'g denied*, 391 U.S. 909 (1968). *See also American Can Co. v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 605, 607 (5th Cir. 1980).

13.     In determining whether to approve a settlement, the bankruptcy court should consider whether the proposed compromise is in the "best interests of the estate." *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). *In re American Reserve Corp.*, 841 F.2d 159, 161 (7th Cir. 1987); *Depo v. Chase Lincoln First Bank,N.A. (In re Depo)*, 77 B.R. 381, 383 (N.D.N.Y. 1987), *aff'd, Depo v. Lincoln Bank*, 863 F.2d 45 (2d Cir. 1988). The bankruptcy court must, respectfully, also bear in mind that "the law favors compromise." *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976); *In re Sherman Homes, Inc.*, 28 B.R. 176, 177 (Bankr. D. Me. 1983). Finally, it has been clearly established that "[t]he Court may give weight to the Trustee's informed judgment that a compromise is fair and equitable." *In re International Distribution Centers, Inc.*, 103 B.R. 420, 423 (S.D.N.Y. 1984), *citing In re Carla Leather*, 44 B.R. 457 (Bankr. S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985).

14.     Utilizing these standards, the Settlement should be approved, as it represents a fair and equitable compromise of the parties' disputes. Moreover, regarding the Bram Will and Muschel LLC estates, creditor claims are not affected by the settlement since the Properties have no mortgage or other liens and therefore to the extent there are undisputed claims outstanding, creditor claims will be satisfied out of the sale proceeds, and to the extent disputed claims are not resolved beforehand, they will be determined in the ordinary course in State Court with the all the rights and defense of the parties reserved. With respect to Broadwall, all creditors other than the equity security holder have been paid in full and the equity security holder consents to the proposed treatment of the rights under the Contract subject to the remaining conditions described in the Settlement.

15.     For the foregoing reasons, the parties respectfully request that this Court approve

the Settlement, including entry of the proposed stipulations and orders of dismissal described

therein (and with respect to Broadwall, an order authorizing entry of a final decree closing its

case) and annexed thereto, and grant such other and further relief as this Court deems necessary

and appropriate.

Dated: Uniondale, New York
        September 20 , 2010

WESTERMAN BALL EDERER MILLER &
SHARFSTEIN, LLP


By: _____ /s/ _____
        Thomas A. Draghi, Esq.
        170 Old Country Road, Suite 400
        Mineola, New York 11501
        (516) 622-9200
        *Attorneys for Broadwall America, Inc.,*
        *Reorganized Debtor*


Dated: New York, New York
        September 20 , 2010


BACKENROTH FRANKEL & KRINSKY LLP


By: _____ /s/ _____
        Abraham Backenroth, Esq.
        489 Fifth Avenue
        New York, New York 10017
        *Attorneys for Bram Will El, LLC and*
        *William Muschel, LLC, Debtors*

EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In re:

      BROADWALL AMERICA, INC.,

                Debtor.

Chapter 11
Case No. 04-13810 (JMP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In re:

      BRAM WILL EL LLC,

                Debtor.

Chapter 11
Case No. 05-10616 (JMP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In re:

      WILLIAM MUSCHEL, LLC,

                Debtor.

Chapter 11
Case No. 05-10617 (JMP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BROADWALL AMERICA, INC.,

                Plaintiff,

          -against-

BRAM WILL EL LLC, and
WILLIAM MUSCHEL, LLC,

Adv. Pro. No. 06-01788 (JMP)
Adv. Pro. No. 06-01789 (JMP)
Adv. Pro. No. 06-01790 (JMP)

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## STIPULATION AND ORDER APPROVING SETTLEMENT

IT IS HEREBY STIPULATED AND AGREED by and among Broadwall America, Inc.

("Broadwall"), the plaintiff in the three above-captioned consolidated adversary proceedings (the

"Adversary Proceedings"), Bram Will El LLC ("Bram Will") and William Muschel, LLC ("W.

person with an economic interest in the disposition of Broadwall's assets; and

WHEREAS, on February 3, 2005, each of the Defendants filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (together, the "Defendants' Bankruptcy Cases") in the Bankruptcy Court; and

WHEREAS, the Defendants continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code, and no committee of unsecured creditors has been appointed in either of the Defendants' Bankruptcy Cases; and

WHEREAS, the Defendants are wholly owned by the Estate, of which Aron Muschel, Reuvan Muschel and Mordechai Muschel are joint executors, and equal distributees of the Estate; and

WHEREAS, following a memorandum decision and order dated March 23, 2005 issued by Judge Blackshear in the Broadwall Bankruptcy Case, Broadwall and the Defendants returned to the Supreme Court of the State of New York, County of New York (the "State Court") to litigate certain issues in an action entitled *Broadwall America, Inc. v. Bram Will El LLC and William Muschel, LLC*, No. 603383/02 (the "State Court Action"); and

WHEREAS, on November 23, 2005, the State Court issued a decision in the State Court Action (the "Lower Court Decision") and granted summary judgment in favor of Broadwall determining that Broadwall had the right to compel a closing under the Contract; and

WHEREAS, the Defendants thereafter posted a bond, and on December 20, 2005, appealed the Lower Court Decision to the Appellate Division, First Department; and

WHEREAS, in a decision dated September 21, 2006 (the "State Appellate Decision"), the First Department reversed the State Court's Summary Judgment Decision and determined that Broadwall had no right to compel a closing under the Contract; and

WHEREAS, on or about October 10, 2006, Broadwall commenced the Adversary Proceedings seeking declaratory and injunctive relief in connection with the scope and validity of the State Appellate Decision; and

WHEREAS, thereafter the Appellate Division denied Broadwall's motion for reconsideration and/or right to appeal to the Court of Appeals and the Court of Appeals denied any further request of appeal; and

WHEREAS, on May 18, 2007, the Defendants filed an amended answer in the Adversary Proceedings; and

WHEREAS, on _____, 2010, the Rabbinical Panel adjudicating the rights between the Muschel brothers determined that Mordechai Muschel would receive distribution of the ownership interest in the debtors Bram Will and W. Muschel, LLC in accordance with the decision of the Rabbinical Panel annexed hereto as Exhibit "A" (the "Rabbinical Court Award") and in accordance with the direction of the Rabbinical Panel as to closing and payment.; and

Formatted: Font color: Auto

WHEREAS, following arm's length and good faith negotiations, to avoid the further expenditure of time, effort and money, and the inconvenience incident to litigating the issues raised in the Adversary Proceedings, the parties desire fully and finally to compromise, settle and resolve the disputes between and amongst them as to the right to close under the Contract on the terms set forth herein; and

WHEREAS, Barnett, as the sole owner of Broadwall and the only remaining party in interest with respect to the Broadwall estate has agreed to have Broadwall withdraw, with prejudice, and release any further claims which it may have, including but not limited to any claims with respect to the Contract, provided that Barnett is released as to any potential claims, if any, against him with respect to the Contract; and

NOW THEREFOR, in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, on consent of the parties, it hereby stipulated, agreed and ordered, as follows:

1.     The recitals and prefatory phrases and paragraphs set forth above are hereby incorporated in full, and made a part of, this Stipulation and Order.

2.     Subject to the terms hereof, notwithstanding anything contained in the Confirmation Order or Plan to the contrary, Broadwall waives any and all rights and/or claims it has or may have against the Muschel Releasors, as hereinafter defined, either under the Contract or otherwise, including, but not limited to any right to acquire the Properties under the Contract, including, without limitation, any right to compel a sale or closing of the Properties under the Contract (the "Waiver"). The Defendants otherwise fully reserve all other rights, claims or defenses that they have against any other parties arising under or otherwise related to the Contract, if any, and nothing contained herein shall impair, prejudice or otherwise affect such rights, claims and defenses including such claims now asserted by Defendants in a certain state court action entitled *Bram Wil-El LLC, et. al v. Extreme Realty, LLC, et. al, case no. 12667/07,*

*Supreme Court of the State of New York, Kings County* ("Defendants Action") none of which rights shall be impaired or affected under this Stipulation of Settlement.

3.    Each of the Defendants will file a motion seeking to dismiss their respective Defendants' Bankruptcy Cases. It is a condition precedent to the effectiveness of this Stipulation and Order, including, without limitation, the Waiver and dismissal of the Adversary Proceedings, that the Bankruptcy Court issue and enter orders, in substantially the forms attached hereto at Exhibit "B", dismissing each of the Defendants' Bankruptcy Cases (together, the "Defendants' Dismissal Orders") and that the Defendants' Dismissal Orders become Final Orders. For purposes of this Stipulation and Order, the term "Final Order" means an order, ruling or judgment of the Bankruptcy Court to which no notice of appeal has been filed and the statutory time to appeal has lapsed, or if an appeal has been filed, an order ruling or judgment has been entered by the appellate court and no appeal has been filed and the statutory time to appeal has lapsed.

4.    Upon the Defendants' Dismissal Orders and this Stipulation and Order all becoming Final Orders, each of the Defendants, the Estate, Mordechai Muschel and their respective predecessors, successors, shareholders, members, officers, principals, employees, agents, heirs and assigns (collectively, the "Muschel Releasors") are deemed to have released Barnett and his predecessors, heirs, executors, administrators, agents, successors and assigns, but not Broadwall or its predecessors, its executors, administrators, agents, successors and assigns that relate to the period prior to the time Barnett acquired the equity interest in Broadwall (collectively, the "Barnett Released Parties") of and from any and all claims, causes of action,

6

suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the Barnett Released Parties the Muschel Releasors ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing (the "Barnett Release"). Anything to the contrary notwithstanding, nothing contained in this Stipulation or in the Barnett Release shall be deemed or construed to waive any claims against any other parties, other than the Barnett Released Parties, and specifically any claims asserted in the Defendants Action. Conversely, the Barnett Released Parties hereby are deemed to have released the Muschel Releasors to the same extent as the Barnett Release given in favor of the Barnett Released Parties. Reuvan Muschel and Aron Muschel shall have the option, exercisable within 20 days of the signing of this Stipulation, to be added as a "Muschel Releasor" and thereby be subject to the release of claims under the Barnett Release and conversely, receive a reciprocal release in return as provided for in this paragraph.

5.  { omitted }

6.  { omitted }

7.  { omitted }

8.  { omitted }

9.  { omitted }

10. Upon the Defendants' Dismissal Orders becoming a Final Order (a) the Waiver and releases granted under this Stipulation shall become effective and fully enforceable; and (b) the Adversary Proceedings will be dismissed on consent of the parties, with prejudice, including but limited to Broadwall's claim for specific performance and enforcement of the Contract, each party to bear their own costs, without the necessity for any further documentation or acts by the Court or the parties. Anything to the contrary notwithstanding, nothing contained in this Stipulation, in the Barnett Release or in the dismissal with prejudice of the Adversary Proceedings, shall be deemed or construed to waive any claims against any other parties, and specifically any claims asserted in the Defendants Action.

11. For purposes of full clarity, notwithstanding anything contained herein to the contrary, the Waiver and the dismissal of the Adversary Proceedings shall be of no force or effect unless and until the Defendants' Dismissal Orders and this Stipulation and Order are all Final Orders

12. Broadwall will file a motion seeking entry of a final decree in the Broadwall Bankruptcy Case and otherwise proceed towards closing the Broadwall Bankruptcy Case, which will be consented to by all parties and signatories to this Stipulation and Order.

12a. Upon the dismissal of these proceedings, Mordechai Muschel shall receive distribution of the ownership interest in the debtors Bram Will and W. Muschel, LLC in accordance with the Rabbinical Panel Award and in accordance with the direction of the Rabbinical Panel as to closing and payment. Upon receipt of distribution of the ownership interests in the debtors Bram Will and W. Muschel, LLC, Mordechai Muschel, as the sole

member of Bram Will and W. Muschel, LLC shall transfer the property owned by Bram Will and W. Muschel, LLC to Gary Barnett or his designee in accordance with the terms of that certain Contract of Sale, dated August 4, 2010, a copy of which is annexed hereto as Exhibit "C".

**Formatted:** Font color: Auto

13. Anything to the contrary notwithstanding, this Stipulation and Order, which Stipulation and Order shall survive any closure, dismissal, conversion or other disposition of the Broadwall Bankruptcy Case and/or the Defendants' Bankruptcy Cases and shall be binding on all successors and assigns.

14. Each of the parties and signatories hereto agrees to cooperate in the execution and delivery of any and all documentation reasonably deemed necessary to effectuate the terms of this Stipulation and Order, including, without limitation, in connection with the dismissal of the Defendants' Bankruptcy Cases and the entry of a final decree or other disposition satisfactory to Broadwall closing the Broadwall Bankruptcy Case.

15. Each of the parties and signatories hereto represents and warrants that:

    (a) they have been advised by counsel in the negotiation, execution and delivery of this Stipulation and Order;

    (b) they have voluntarily, with full knowledge and without fraud, coercion, duress or undue influence of any kind, entered into this Stipulation and Order; and

    (c) their counsel has reviewed this Stipulation and Order and that the normal rules of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Stipulation and Order.

16.     The provisions of this Stipulation and Order shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors, heirs, assigns, parents, subsidiaries, affiliated companies, and all of their members, shareholders, principals, officers, agents, servants, and employees.

17.     This Stipulation and Order shall be governed and construed in accordance with the laws of the State of New York without giving effect to the conflict of laws or choice of law provisions thereof, except to the extent that the law of the United States governs any matter set forth herein, in which case such federal law shall govern.

18.     This Stipulation and Order is conditioned upon the execution and delivery of all documents, if any, referenced herein. The parties and signatories agree to cooperate in the execution and delivery of any such documents.

19.     This Stipulation and Order and the documents executed in connection herewith contain the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters. This Stipulation and Order cannot be changed, waived or terminated orally.

20.     This Stipulation and Order may be signed in one or more counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same agreement. The signatures on this Stipulation and Order may be exchanged and transmitted by facsimile transmission, which signatures shall be deemed originals and shall be deemed valid and binding for all purposes. In the event that suit or a proceeding is brought to enforce the terms of this Stipulation and Order, the movant shall not be required to produce or introduce into evidence a

copy of this Stipulation and Order bearing original signatures of the parties, other than facsimile signatures.

21. This Stipulation and Order was drafted with full and equal participation from the parties and signatories and their counsel, and no provision herein may be construed against or in favor of any of the parties based upon any weight otherwise accorded by law to or against the draftsman of a document.

22. This Stipulation and Order is subject to approval by the Bankruptcy Court. If, after execution and submission of this Stipulation and Order to the Bankruptcy Court, (a) it is not approved by the Bankruptcy Court or the Defendants' Dismissal Orders do not become Final Orders, or (e) the Adversary Proceedings are not dismissed in accordance with the terms hereof, then, in such event, this Stipulation and Order shall be null and void and of no further force or effect and the parties shall be returned to their pre-settlement position, without prejudice to or waiver of any parties' rights or remedies in connection with the matters that are the subject hereof.

23. No failure or delay by any party in exercising any right, power, or privilege under this Stipulation and Order or applicable law shall operate as a waiver against that party.

24. The invalidity, illegality, or unenforceability of any provision of this Stipulation and Order shall not affect any other provision of this Stipulation and Order, which shall remain in

full force and effect and which shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

Formatted: Indent: First line: 0"

Dated: February __, 2010

**Consented and Agreed:**

BROADWALL AMERICA, INC.

By: _____

_____
Gary Barnett

BACKENROTH FRANKEL & KRINSKY
*Counsel for Bram Will El, LLC*
*William Muschel, LLC*

By: _____
Abraham Backenroth (AB-1989)
489 Fifth Avenue – 28th Floor
New York, New York 10017
(212) 593-1100

BRAM WILL EL, LLC

By: Morechai Muschel

WILLIAM MUSCHEL, LLC

By: Mordechai Muschel

New York, New York
IT IS SO ORDERED, THIS
____ DAY OF _____, 2010

_____
Honorable James M. Peck
United States Bankruptcy Judge

12

EXHIBIT  A

_Translation from the H E B R E W  language_

## Rabbinical Court of Justice of America – Eim Moshe

Founded by and in memory of the Rabbinical Torah Scholar
the late Maharam Halevi Stienberg, of blessed memory
Chief Rabbi of Brody
160 Broadway – suite 1011 – New York, NY 10038
(212) 385-0006 – Fax (212) 385-0007 – Brooklyn Fax (718) 375-3418

Rabbinical Arbitration
Family Matrimonial Counseling
Reconciliations / Divorces
Heritage Identity
Halachic Guidance

**Rabbi Solomon B. Herbst,** _Rosh Beth Din_

### Rabbinical Court Ruling

### By the Grace of G-d

With regards to the distribution of the estate between the Moshel brothers, i.e. Mr.
Re'uven Moshel and Mr. Aron Moshel, and Mr. Mordchei Moshel, about which the
Rabbinical Court signed hereinafter has issued a number of partial rabbinical Court
Rulings, and now, because of various reasons, the Rabbinical Court has decided to alter
the Rabbinical Court Ruling, as described hereinafter:

Being that the portion which was designated to be Mr. Mordchei's portion according to a
number of Rabbinical Court Rulings we issued by us, beginning from the date of 27
Tammuz 5766 [civil calendar: July 23, 2006], i.e. the buildings situated at the address of
734-736 Broadway New York, NY (hereinafter "734-736"), were in bankruptcy not by
Mordchei's fault, and as such he has not received his portion formally, because when a
property is in bankruptcy it cannot be delivered free of any encumbrances; and

Being that the value of real property has recently decreased because of the economic
situation in the world, therefore the Rabbinical Court has decided to once again assess the
properties, and in light of that we have now issued a different Rabbinical Court Ruling
from that which we have issued previously. This, pursuant to the provisions of the
arbitration agreement which the parties have signed on 12 Cheshven 5765, which
corresponds to the civil calendar date of October 27, 2004, when they accepted upon
themselves to litigate before us; here is what the agreement says in part: "… we also
accept the Rabbinical Court over any dispute which may arise, both on the interpretation
of the Rabbinical Court Ruling, and on matters that branch out of the Rabbinical Court
Ruling, and even after the Rabbinical Court Ruling has been implemented"… up to here
that's relevant to the case at hand.

The change is as follows:

That which was provided in the agreement signed by the parties on June 21, 2007, referred to as "Letter Agreement" (hereinafter "the agreement of the parties"), which was confirmed and signed by the Rabbinical Court, and then it was re-confirmed by the Rabbinical Court on May 15, 2008, that Mordchei Moshel will receive the buildings at the address of 734-736, and he will reimburse the heirs' account in the control of the attorney Mr. Sol Hershkowitz with the amount of 4.5 million dollars, and that Re'uven Moshel will receive a portion of these funds; and in a certain scenario which is described in Sec. 3 there, he will receive the building located at the address of 734 Broadway, NY – it has now been decided by the Rabbinical Court to change said decision (for the aforementioned reasons), as follows:

1] Mordchei Moshel will receive 734-736

2] Mordchei will reimburse the heirs' account by the amount of $1,827,000.00. He will reimburse this amount at the same time when we receives the

*SBH   AJG   MSG*

formal deed in his name.

3] The aforementioned funds to be reimbursed by Mordchei should be held by the attorney Mr. Sol Hershkowitz, and after all of the costs that rest upon the estate assets will be paid from these funds, the Rabbinical Court will distribute the rest of the funds as they see fit, and when they see fit.

On this we have affixed our signatures on 18 Cheshvan 5770 [civil calendar: November 5, 2009].

Says: [signature] Shlomo Benzion Herbst,    Rabbinical Judge
Says: [signature] Alexander Jacob Segal Gross,    Rabbinical Judge
Says: [signature] Moshe Shlomo Gabyoff,    Rabbinical Judge

EXHIBIT  B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
In re:

BRAM WILL EL LLC,                              Chapter 11
                                               Case No. 05-10616 (JMP)

                          Debtor.
------------------------------------------------------------ x
In re:

WILLIAM MUSCHEL, LLC,                          Case No. 05-10617(JMP)

                          Debtor.
------------------------------------------------------------ x

## ORDER OF DISMISSAL

 A hearing having been held before the Honorable James M. Peck at the United States Bankruptcy Court, One Bowling Green, New York, New York 10004-1408, on the 19th day of October, 2010 at 10:00 a.m. to consider the application of Bram Will El LLC and William Muschel, LLC to dismiss their Chapter 11 cases pursuant to section 1112 of the Bankruptcy Code ("Application"), and the Debtors, Bram Will El LLC and William Muschel, LLC, having appeared by it counsel, Backenroth Frankel & Krinsky, LLP, in support of the Application, and the Court having considered the argument of all the parties, and based upon the record and sufficient cause appearing therefore, it is

 ORDERED, that the Application is granted and the Bram Will El LLC proceedings, case number 05-10616 (JMP), and the William Muschel, LLC proceedings, case number 05-10617 are hereby dismissed; and it is further

 ORDERED, that the Debtors, Bram Will El LLC and William Muschel, LLC shall pay all U.S. Trustee fees which may have accrued up to the date of this order of dismissal.

Dated: New York, New York
   October , 2010


         _____
         **Hon. James M. Peck**
         **Bankruptcy Judge**

EXHIBIT C

# CONTRACT OF SALE

CONTRACT (this "Contract"), dated the 4th day of August, 2010 by and between, BRAM WILL EL, LLC, WILLIAM MUSCHEL, LLC and MORDECHAI MUSCHEL (collectively and individually referred to as "Seller"), with a mailing address at c\o Rivkin Radler LLP, 926 RXR Plaza, Uniondale, New York 11556, (the "Seller") and Extell Development Company, a Missouri Corporation, with a mailing address at 805 Third Avenue, New York, New York 10022 (the "Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

## SECTION 1. SALE OF PREMISES AND ACCEPTABLE TITLE

**Section 1.01.** Seller shall sell to Purchaser and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this Contract, all of the following (being hereinafter collectively called the "Premises"):

(a) the parcels of land described on Schedule "A" attached hereto (collectively the "Land") located in the County of New York, the City of New York and the State of New York, designated as Blocks 545, lots 21 & 22, on the New York County Tax Map and known as and by the following address 734 & 736 Broadway, New York, New York 10003.

(b) all buildings and improvements situated on the Land (collectively, the "Building");

(c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway;

(d) the appurtenances and all of the estate and rights of Seller in and to the Land and the Building;

(e) all air rights and/or other development rights relating in any way to the Land and/or the Building and/or the Premises; and

(f) all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Building (collectively, the "Personal Property"). Seller and Purchaser agree that all fixtures, equipment and other items of personal property owned by any person or firm presently or hereafter occupying the Building are expressly excluded from the Personal Property and are not intended to be conveyed by Seller to Purchaser or acquired by Purchaser from Seller.

**Section 1.02.** Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this Contract, subject only to the following matters (collectively, the "Permitted Exceptions"):

(a)     any state of facts any Survey or physical inspection of the Premises may show provided same do not render title to the Premises uninsurable;

(b)     covenants, restrictions, easements and party wall reservations, and agreements of record, if any, provided same are not violated by the Building or the use thereof;

(c)     encroachments or projections upon any street or road of areas, grating, steps, windows, balconies, ornamental stone, tile, brick, eaves, trim and cornices provided such facts do not render title to the Premises uninsurable;

(d)     variations, if any, between fences, retaining walls and record lines, provided such variations do not render title to the Premises uninsurable without payment of additional title insurance premium provided same are not violated by improvements and the Buildings;

(e)     rights, if any, of the city, town or village in which the Premises lie with respect to vaults under the sidewalk beyond the building line provided that all fees to said municipalities are paid;

(f)     consents of record by Seller or any former owner of the Premises in favor of any governmental authority for the erection of any structure, or structures, on, under and above any streets or roads in front of or adjoining the Premises provided same do not prevent access to or from the Premises;

(g)     zoning regulations and ordinances of the city, town or village in which the Premises lie, which are not violated by the Building or the use thereof;

(h)     except as otherwise set forth in Section 8 hereof, all notes or notices of violations of law or municipal ordinances, orders or requirements noted in or issued by the Departments of Housing and Buildings, Fire, Labor, Health, or other State or Municipal Departments having jurisdiction against or affecting the Premises. Notwithstanding anything to the contrary in this Section 1.02(h), at Closing, Seller shall pay all fines, penalties and liens associated with any violations (except for any violations regarding the lack of a certificate of occupancy or work needed to be done to cure same which are issued after the date this contract becomes effective pursuant to Section 27 and up to $25,000 and any sums beyond $25,000 shall be the responsibility of Seller. Any violations issued after ninety days from the Effective Date of this Contract shall be the responsibility of Purchaser provided the contract becomes effective pursuant to Section 27), but Seller shall not be obligated to remove them from the record prior to or at the Closing.

(i)     all leases or tenancies now affecting the Premises and any new leases or tenancies not prohibited by this Contract;

(j)     financing statements, chattel mortgages and liens on personalty filed more than five (5) years prior to the Closing Date (as hereinafter defined) and not renewed, or

filed against property or equipment no longer located on the Premises or owned by tenants;

(k) the standard printed exceptions contained in any certificate of title or title policy issued to Purchaser by any title company authorized to issue title insurance in the State of New York;

(l) such other matters as any reputable title insurance company shall be willing, without special premium, to except with insurance against collection out of or enforcement against the Premises as to the fee;

(m) the lien of taxes and assessments not yet due and payable (it being agreed by Purchaser and Seller that if any tax or assessment is levied or assessed with respect to the Premises after the date hereof and the owner of the Premises has the election to pay such tax or assessment either immediately or under a payment plan with interest, Seller may elect to pay under a payment plan, which election shall be binding on Purchase);

(n) any exceptions caused by Purchaser, its agents, representatives or employees;

(o) Notice of sidewalk violations, if any.

(p) Any open permits and\or the lack of a valid certificate of occupancy for the Premises.

(r) Boundary Line Agreement found in Liber 4449, page 354 (affects lot 22)

## SECTION 2. PURCHASE PRICE AND ACCEPTABLE FUNDS

**Section 2.01.** The purchase price (the "Purchase Price") to be paid by Purchaser to Seller for the Premises shall be ELEVEN MILLION ($11,000,000) DOLLARS, which shall be paid as follows:

(a) On the signing of this Contract, TWO HUNDRED FIFTY THOUSAND ($250,000) DOLLARS, by check subject to collection or by wire transfer to Mordechai Muschel or his designee(the "Contract Deposit");

(b) On the Closing date, as hereinafter defined, pursuant to the terms of this Contract Seller shall be credited SEVEN HUNDRED FIFTY THOUSAND ($750,000) DOLLARS, as full satisfaction of a $750,000 loan made by Gary Barnett to Mordechai Muschel ("the Barnett Loan") which is currently due and outstanding;

(c) TEN MILLION ($10,000,000) DOLLARS on the Closing Date (subject to adjustment pursuant to the terms of this Contract) in accordance with the provisions of Section 2.02 hereof.

If the check representing the Contract Deposit fails due collection, unless Purchaser replaces such check with good funds in accordance with Section 2.02 hereof within three (3) business days after written notice to Purchaser, Seller may, at its option, declare this Contract null, void

and of no force and effect and may pursue its remedies against the Purchaser for liquidated damages in the amount of $15,000.00 plus the cost and expense, including reasonable attorney's fees, of any action or proceeding associated therewith.

**Section 2.02.** All monies payable under this Contract, unless otherwise specified in this Contract, shall be paid by:

      (a)    certified checks of Purchaser or any person or entity making an investment in or gift or purchase money loan to Purchaser drawn on any bank, savings bank, trust company or savings and loan association and having a banking office in the State of New York and payable directly to the order of Seller; or

      (b)    official bank checks drawn by any such banking institution payable directly to the order of Seller; or

      (c)    wire transfer to an account designated by Seller on the Closing Date.

In all cases, Seller shall provide purchaser with a list of the names and payees of the checks or wire transfers (and, in the case of wire transfers, wiring instructions) at least two (2) business days before the Closing.

**Section 2.03.** Except for the Contract Deposit, all monies payable under this Contract, unless otherwise specified in this Contract, shall be paid by:

      (a)    certified checks of Purchaser or any person or entity making an investment in or gift or purchase money loan to Purchaser drawn on any bank, savings bank, trust company or savings and loan association and having a banking office in the State of New Jersey and payable directly to the order of Seller; or

      (b)    official bank checks drawn by any such banking institution payable directly to the order of Seller; or

      (c)    wire transfer to an account designated by Seller on the Closing Date.

**Section 2.04.** Intentionally Omitted.

**Section 2.05.** No portion of the Purchase Price is attributable to the Personal Property included in the sale of the Premises to Purchaser.

**Section 2.06.** The parties agree that the purchase price for the Premises shall be allocated as follows: 734 Broadway $4,500,000 and 736 Broadway $$6,500,000 subject to reallocation as agreed to by the parties.

## SECTION 3. CLOSING

**Section 3.01.** Except as otherwise provided in this Contract, the closing of title pursuant to this Contract (the "Closing") shall take place ninety (90) days from the date of

execution and delivery of the contract to Purchaser (the "Execution Date") except that upon written notice to Seller on or before seventy five (75) days after the Execution Date and tender by Purchaser of an additional $150,000 to Seller, $110,00 which shall be credited toward the Purchase Price, the Closing shall take place one hundred fifty days (150) days from the Execution Date or sixty (60) days from the issuance of the Bankruptcy Court Order allowing the sale to proceed or dismissing the existing bankruptcy case; whichever occurs later (such date and any date the Closing is adjourned to being herein referred to as the "Closing Date") at the offices of Rivkin Radler LLP. 926 RXR Plaza, Uniondale, New York 11556-0111, or at such offices as may be designated within the County of Nassau or the City of New York by Purchaser's lender. Time shall be of the essence as to the Closing Date. If the Closing Date shall not be a business day under the laws of the State of New York, the Closing shall occur on the next business day after the Closing Date. The attorneys for the parties are hereby authorized to agree in writing upon adjournments of the Closing Date. In the event Purchaser tenders the additional $150,000 provided for herein, Seller shall execute a new Confession of Judgment and Guaranty for an additional $110,000 which shall be held in escrow and released in accordance with Sections 9, 14, 16 and 27.

## SECTION 4. REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser to the knowledge of its Designated Employees (as defined in Section 4.04) as of the date hereof and as of the Closing Date as follows:

**Section 4.01.** Seller represents and warrants to Purchaser that he has the requisite power and authority to convey the Premises to Purchaser in accordance with the terms of this Contract. Seller further represents and warrants to Purchaser that (a) Seller shall be the sole owner of the Premises; (b) the Premises shall be delivered to Purchaser at Closing free and clear of all liens or encumbrances subject only to the Permitted Exceptions; (c) Seller or anyone acting on his behalf has not sold, leased or entered into any contact or agreement to sell or lease unless as set forth herein all or any part of the Premises to any person or entity other than Purchaser; and (d) there is no litigation pending or threatened against Seller which would affect Seller's obligation to deliver clear title to the Premises to Purchaser at Closing except as set forth on the schedule of Litigation and Claims annexed hereto as Schedule "B".

**Section 4.02.** The information concerning written leases for space at the Property (which together with all amendments, modifications and extensions thereof are collectively referred to herein as the "Leases") and statutory tenancies, if any, set forth in Schedule "C" attached hereto (the "Rent Schedule") is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and there are no Leases of any space in the Building or statutory tenancies other than those set forth therein and there are no subleases or subtenancies. True and correct copies of all Leases and any amendments, modifications and extensions thereto have been scheduled to and initialed by Purchaser or its representative. The Leases are in full force and effect and none of them have been modified, amended or extended, except as otherwise provided on Schedule "C". Nothing contained in this Section 4.02 is intended (and shall not be construed) as a representation by Seller of the parties that are in actual possession of any portion of the Premises since there may be subtenants, licensees or assignees that are in possession of portions of the Premises of which Seller may not be aware. In addition, the Rent Schedule provided in Schedule "C" shall only be deemed to be materially inaccurate or incorrect if it is inaccurate or incorrect by more than 5% of the gross monthly income for the Premises as set forth therein. The rents set forth on Schedule "C" are being collected on a current basis, there

are no arrearages in excess of one month and there are no pre-paid rents other than as set forth on Schedule "C". There are no security deposits other than those set forth in Schedule "C". Seller's representations in this Section 4.02 shall only apply to the rental units set forth in the annexed Schedule "D".

**Section 4.03.** No tenant or no other party has the right to purchase the Premises or a right of first refusal or first offer with respect to a sale of the Premises. No renewal or extension option or options for additional space have been granted to tenants. No tenant is entitled to rental concessions or abatements outside of the lease. Seller's representations in this Section 4.03 shall only apply to the rental units set forth in the annexed Schedule "D".

**Section 4.04.** The Designated Employees of Seller are the individuals who have been primarily responsible for the management of the Premises on behalf of Seller for the three (3) year period immediately prior to the date hereof and are currently employed by Seller. Jacob Eisenstein of EK Realty shall be deemed the "Designated Employee" for the purposes of this Contract.

**Section 4.05** To the best of Seller's knowledge, no action or proceeding, voluntary or involuntary is pending against any commercial tenant under any bankruptcy or insolvency act. Seller has not sent written notice to any tenant claiming that such tenant is in default, which default remains uncured. Seller's representations in this Section 4.05 shall only apply to the rental units set forth in the annexed Schedule "D".

**Section 4.06** No leasing commissions are due or owing with respect to any of the Leases. Seller's representations in this Section 4.06 shall only apply to the rental units set forth in the annexed Schedule "D". Notwithstanding anything herein to the contrary, Mordechai Muschel agrees to defend, indemnify and hold Seller harmless from and against any and all claims, damages, losses, expenses, causes of action, suits, penalties, judgments, and/or liabilities, including reasonable attorneys' fees, arising out of or in connection with any claim for brokerage or leasing commissions with respect to any of the Leases.

**Section 4.07** Seller has entered into no service, maintenance, supply and management contracts ("Service Contracts") affecting the Premises that will be binding upon Seller after closing. Seller does not employ individuals who are unionized and no efforts have been made by Seller's employees to unionize.

**Section 4.08** Seller is not a "foreign person" as defined in Internal Revenue Code Section 1445 and regulations issued thereunder.

**Section 4.09** Except as set forth in Section 27 herein, Seller has taken all necessary action to authorize the execution, delivery and performance of this Contract and has the power and authority to execute, deliver and perform this Contract and consummate the transaction contemplated hereby.

**Section 4.10** Seller represents that the 5th floor of 734 Broadway, New York, New York , and the retail space on the first floor of 736 Broadway (collectively the "Vacant Space") are vacant, there are no leases affecting the Vacant Space, no options to lease the Vacant Space, and no other claims by any individual or entity to any rights of occupancy in the Vacant Space.

**Section 4.11**  Seller represents that neither Seller nor EK Realty have received notification from the tenant of the Fifth Floor in 736 Broadway, Alfonso Rufolo, regarding the amount of money paid by said tenant for improvements to tenant's unit as provided for in section R 14 of tenant's lease, dated May 8, 2009 with Seller.

**Section 4.12**  Each of the representations and warranties of Seller in this Section 4 and elsewhere in this Contract shall survive for a period of seven (7) months after Closing. All indemnities by Seller in favor of Purchaser in this Contract shall survive for a period of seven (7) months after Closing. Each of the representations and warranties made by Seller in this Contract shall be deemed restated and shall be true and accurate on the Closing Date.

## SECTION 5.  REPRESENTATIONS AND WARRANTIES OF PURCHASER

**Section 5.01.**  Purchaser has the requisite power and authority and the financial resources to purchase the Premises from Seller in accordance with the terms of this Contract.

## SECTION 6.  PURCHASER'S DUE DILIGENCE/CONDITION OF THE PREMISES

**Section 6.01.**  Purchaser acknowledges that prior to Purchaser's execution of this Contract:

(a)  Seller has made available to Purchaser and otherwise allowed Purchaser access to Documents (as defined in Section 6.04); and

(b)  Purchaser has conducted (or waived its right to conduct) all such Due Diligence (as defined in Section 6.04) with respect to the Premises as Purchaser considers necessary or appropriate.

Purchaser has reviewed, examined, evaluated and verified the results of its Due Diligence to the extent it deems necessary or appropriate with the assistance of such experts as Purchaser deemed appropriate. In particular, Purchaser has determined to its satisfaction the assignability of any Documents to be assigned hereunder. Purchaser acknowledges and agrees that it (x) is familiar with the physical condition of the Premises, (y) has completed its Due Diligence to its satisfaction, and (z) except for Seller's Warranties (as defined in Section 6.04), is acquiring the Premises based exclusively upon its own Due Diligence.

**Section 6.02.**  Except as provided herein, Purchaser acknowledges and agrees that (i) the Premises are being sold, and Purchaser shall accept possession of the Premises on the Closing Date, "AS IS, WHERE IS, WITH ALL FAULTS", with no right of setoff or reduction in the Purchase Price; (ii) except for Seller's Warranties, none of the Seller Parties (as defined in Section 6.04) have or shall be deemed to have made any verbal or written representations, warranties, promises or guarantees (whether express, implied, statutory or otherwise) to Purchaser with respect to the Premises, any matter set forth, contained or addressed in the Documents (including, but not limited to, the accuracy and completeness thereof) or the results of Purchaser's Due Diligence; and (iii) Purchaser has confirmed independently all information that it considers material to its purchase of the Premises or the transaction contemplated herein.

Purchaser specifically acknowledges that, except for Seller's Representations and Warranties set forth in Section 4 of this Contract, Purchaser is _not_ relying on (and Seller and each of the other Seller Parties does hereby disclaim and renounce) any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Seller or any other Seller Parties, as to: (1) the operation of the Premises or the income potential, uses, or the merchantability, habitability or fitness of any portion of the Premises for a particular purpose; (2) the physical condition of the Premises or the condition or safety of the Premises or any component thereof, including, but not limited to, plumbing, sewer, heating, ventilating and electrical systems, roofing, air conditioning, foundations, soils and geology, including Hazardous Materials, lot size, or suitability of the Premises or any component thereof for a particular purpose; (3) the presence or absence, location or scope of any Hazardous Materials in, at, about or under the Premises; (4) whether the appliances, if any, plumbing or utilities are in working order; (5) the habitability or suitability for occupancy of any structure and the quality of its construction; (6) whether the improvements are structurally sound, in good condition, or in compliance with applicable Laws; (7) the accuracy of any statements, calculations or conditions stated or set forth in Seller's books and records concerning the Premises or set forth in any of Seller's offering materials with respect to the Premises; (8) the dimensions of the Premises or the accuracy of any floor plans, square footage, lease abstracts, sketches, or revenue or expense projections related to the Premises; (9) the operating performance, the income and expenses of the Premises or the economic status of the Premises; (10) the ability of Purchaser to obtain any and all necessary governmental approvals or permits for Purchaser's intended use and development of the Premises; and (11) the leasing status of the Premises or the intentions of any parties with respect to the negotiation and/or execution of any lease for any portion of the Premises. Purchaser further acknowledges and agrees that, except for Seller's Warranties, Seller is under no duty to make any affirmative disclosures or inquiry regarding any matter which may or may not be known to Seller or any of the other Seller Parties, and Purchaser, for itself and for its successors and assigns, hereby expressly waives and releases Seller and each of the other Seller Parties from any such duty that otherwise might exist. Any reports, repairs or work required by Purchaser are the sole responsibility of Purchaser, and Purchaser agrees that there is no obligation on the part of Seller to make any changes, alterations or repairs to the Premises or to cure any violations of law or to comply with the requirements of any insurer.

**Section 6.03.** Except as expressly provided herein below in this Section 6.03, Purchaser, for Purchaser and Purchaser's successors and assigns, hereby releases Seller and each of the other Seller Parties from, and waives all claims and liability against Seller and each of the other Seller Parties for or attributable to, the following:

(i)      any and all statements or opinions heretofore or hereafter made, or information furnished, by the Seller Parties to Purchaser or any of Purchaser's Representatives (as defined in Section 6.04); and

(ii)     any and all losses, costs, claims, liabilities, expenses, demands or obligations or any kind or nature whatsoever attributable to the Premises, whether arising or accruing before, on or after the Closing Date and whether attributable to events or circumstances which have heretofore or may hereafter occur, including, without limitation, (A) all losses, costs, claims, liabilities, expenses, demands and obligations with respect to the structural, physical, or environmental condition of the Premises and (B) all losses, costs, claims, liabilities, expenses, demands and obligations

relating to the release of or the presence, discovery or removal of any hazardous materials in, at, about or under the Premises, or for, connected with or arising out of any and all claims or causes of action based upon CERCLA (Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§9601 *et seq.*, as amended by SARA (Superfund Amendment and Reauthorization Act of 1986) and as may be further amended from time to time), the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§6901 *et seq.*, or any related claims or causes of action or any other federal, state or municipal based statutory or regulatory causes of action for environmental contamination at, in, about or under the Premises;

The release and waiver set forth in this Section 6.03 is not intended and shall not be construed to affect or impair any rights or remedies that Purchaser may have against Seller pursuant to this Contract as a result of a breach of any of Seller's Warranties or breach of any other provision of this Contract. Purchaser acknowledges and agrees that the provisions of this Section 6.03 were a material factor in Seller's acceptance of the Purchase Price and, while Seller has provided the Documents and cooperated with Purchaser, Seller is unwilling to sell the Premises unless Seller and the other Seller Parties are expressly released as set forth in Section 6.03.

**Section 6.04.** For purposes of this Section 6, each of the following terms shall have the meaning set forth below.

"Purchaser's Representatives" shall mean Purchaser, its partners, and members and any officers, directors, employees, agents, representatives and attorneys of Purchaser, its partners or members.

"Documents" shall mean the documents and instruments applicable to the Premises or any portion thereof that Seller or any of the other Seller Parties deliver or make available to Purchaser prior to Closing or otherwise allow Purchaser access to prior to Closing.

"Due Diligence" shall mean examinations, inspections, investigations, tests, studies, analyses, appraisals, evaluations and/or investigations with respect to the Premises, the Documents, and other information and documents regarding the Premises, including, without limitation, examination and review of title matters, applicable land use and zoning Laws and other laws applicable to the Premises, the physical condition of the Premises, and economic status of the Premises.

"Hazardous Materials" shall mean any substance, chemical, waste or material that is or becomes regulated by any federal, state or local government authority because of its toxicity, infectiousness, radioactivity, explosiveness, ignitability, corrosiveness or reactivity, including, without limitation, asbestos or any substance containing more than 0.1 percent asbestos, the group of compounds known as polychlorinated biphenyls, flammable explosives, oil, petroleum or any refined petroleum product.

"Seller Parties" shall mean and include, collectively, (a) Seller; (b) its counsel; (c) broker; (d) Seller's property manager, (e) any direct or indirect equity owner, officer, director, employee, or agent of Seller, its counsel, broker or Seller's property manager; and (f) any other entity or individual affiliated or related in any way to any of the foregoing.

"Seller's Warranties" shall mean Seller's representations and warranties set forth in Section 4 of this Contract.

**Section 6.05.** The terms of this Section 6 are intended to survive the Closing or earlier termination or expiration of this Contract.

## SECTION 7. SELLER'S OBLIGATIONS AS TO LEASES

**Section 7.01.** Between the date of this Contract and the Closing, Seller shall operate the Premises as conducted prior to the date hereof and shall not, without Purchaser's prior written consent, which consent may be withheld by Purchaser in its sole and absolute discretion, for any reason or for no reason: (a) amend any Lease in any respect (unless required by law), or (b) terminate any Lease, except by reason of a default by the tenant thereunder. The foregoing obligation of Seller in this Section 7.01 shall apply only to the rental units set forth in the annexed Schedule "D".

**Section 7.02.** Between the date of this Contract and the Closing, Seller shall not permit occupancy of, or enter into any new lease for, space in the Building which is presently vacant or which may hereafter become vacant, or renew or extend any existing Lease (unless required by law).

**Section 7.03.** If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Seller in violation of any restrictions contained in this Contract.

**Section 7.04.** Seller does not warrant that any particular Lease will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this Contract in any manner or entitle Purchaser to an abatement of or credit against Purchase Price or give rise to any other claim on the part of Purchaser.

**Section 7.05** Seller hereby assigns all security deposits and any sums of money held in escrow on behalf of any Tenant of the Property to Purchaser.

## SECTION 8. RESPONSIBILITY FOR VIOLATIONS

**Section 8.01.** All notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior to or after the date of this Contract by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises and all liens which have attached to the Premises prior to the Closing pursuant to the Administrative Code of the City of New York, if applicable, shall not be required to be removed nor complied with by Seller and shall not be an objection to title, provided however:

(a)     Purchaser assumes no responsibility for criminal violations, if any, and Seller shall remain liable for the discharge, prior to Closing, of any such violations;

(b)    the cost and expense of discharging liens which have attached to the Premises prior to the Closing pursuant to the Administrative Code, if any, shall be borne by Seller and deducted from the balance of the Purchase Price payable at Closing; and

(c)    the cost and expense of discharging liens which attach to the Premises and are as of record as a consequence of emergency repairs by New York City prior to the Closing shall be borne by Seller and deducted from the balance of the Purchase Price payable at Closing.

**Section 8.02.**  If the reasonably estimated aggregate cost to discharge liens which Seller is required to remove shall exceed $600,000 for any and all of the properties comprising the Premises (which sum shall include any sum expended by Seller under Section 14.02 hereof), Seller shall have the right to cancel this Contract, in which event the sole liability of Seller shall be as set forth in Section 14.02 unless Purchaser elects to accept title to the Premises subject to all such liens, in which event Purchaser shall be entitled to a credit of an amount equal to $600,000 against the monies payable at the Closing. Notwithstanding anything to the contrary in this Section 8.02, Seller, at or prior to Closing shall remove all voluntary and consensual liens from the record.

**Section 8.03.**  Any violations which a tenant is required to remove or comply with pursuant to the terms of its lease by reason of such tenant's use or occupancy shall not be an objection to title hereunder and Seller shall have no responsibility under this Section in respect thereto. Purchaser shall accept the Premises subject to all such violations without any abatement of or credit against the Purchase Price.

**Section 8.04.**  If required, Seller, upon written request by Purchaser, shall promptly furnish Purchaser with written authorization to make any necessary searches for the purpose of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

## SECTION 9.  DESTRUCTION, DAMAGE OR CONDEMNATION

**Section 9.01.**  The provisions of Section 5-1311 of the General Obligations Law shall not apply to the sale and purchase of the Premises provided for in this Contract.

**Section 9.02.**  Simultaneously with the execution of this Contract, Mordechai Muschel shall deposit in escrow with Snitow Kanfer Holtzer & Millus, LLP, (the "Escrow Agent") the following: (i) a security agreement granting Purchaser a security interest in Rachel Muschel's shares in a Yellow Shutters Owners Corp. (the "Muschel Co-op") (the "Security Agreement"), (ii) a note and mortgage in the amount of $200,000 (collectively, the "Mortgage") (iii) an affirmation of confession of judgment (the "Affirmation"), (iv) an assignment of the Proprietary Lease of the Muschel Co-op ("Assignment") and a Stock Power authorizing the transfer of Rachel Muschel's shares in the Muschel Co-op ("Stock Power")  and (v) a Guaranty executed by Mordechai Muschel and Rachel Muschel guaranteeing payment of the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, to Purchaser and guaranteeing payment of $850,000, which represents the Barnett Loan and interest accrued thereon as well as attorneys' fees incurred in collecting the Barnett Loan (the "Default Payment") to Purchaser (the "Guaranty"). If by reason of fire or other casualty, Purchaser determines that the Property shall be damaged or

destroyed so that it shall require repairs which exceed $750,000, Purchaser shall have the right either (a) to terminate this Contract, in which event this Contract shall be null and void and of no further force and effect and neither party shall have any further claims against the other party, except that Seller shall return the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, to Purchaser and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing, or (b) have this Contract continue in full force and effect, in which event Purchaser shall have no right to a reduction in the Purchase Price. However, Seller agrees to assign to Purchaser any right, title and interest Seller may have in and to insurance policy(s) and proceeds relating to such fire or casualty and to pay Purchaser the amount of any deductible with respect to such insurance. If the Premises are damaged by fire but the amount necessary to repair the Premises is not in excess of $750,000, the Closing shall proceed as scheduled herein and Seller shall assign to Purchaser the proceeds of any casualty insurance and pay to Purchaser the amount of any deductible with respect to such insurance and Seller shall not have any responsibility for the restoration or repair of the Premises. In the event the proceeds of any casualty insurance is insufficient to fully repair the damage, Purchaser shall have the right to terminate this Contract, in which event this Contract shall be null and void and of no further force and effect and neither party shall have any further claims against the other party, except that Seller shall return the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, to Purchaser and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing. . In the event of termination by Purchaser under this Section 9.02 or in the event of termination of this Contract under any other provision of this Contract, the forgiveness of the loan described in Section 2.01(b) shall be null and void, the loan shall automatically be reinstated in the amount of $850,000, and Seller shall return the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereonto Purchaser and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense,

against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing.

**Section 9.03.** (a) In the event of a condemnation, partial or complete, temporary (except as hereinafter provided) or otherwise, the effect of which will be to (i) reduce the rent collectable on the date of taking from the leasing of space in the Building by more than twenty (20%) or (ii) cause the existing improvements on the premises not to be in compliance with applicable zoning laws and regulations, Seller shall give notice thereof to Purchaser and Purchaser shall have thirty (30) days to elect to terminate this Contract. The receipt by Seller of a notice of pending or threatened taking shall constitute an event of condemnation for purposes of this Contract. If Purchaser elects to terminate, neither party shall have any further obligation to the other, except that Seller shall return the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, to Purchaser and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a hard money lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Section 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing. All proceeds of a condemnation or taking shall belong to Seller and Purchaser shall have no claim with respect thereto, except if Purchaser elects not to terminate this Contract, in which event all conditions of the Closing shall be deemed waived with respect to the portion taken, Seller shall deliver an assignment of the condemnation award for the portion taken and the Purchase Price will be immediately paid to Seller as if the Closing had occurred for the portion taken. All of the terms and conditions of this Contract for the balance of the Premises shall continue in full force and effect.

(b) A temporary taking which, by its terms, shall be terminated before Closing (or the reasonable projection thereof) shall not give rise to the option to terminate this Contract.

## SECTION 10.        COVENANTS OF SELLER

Seller covenants that between the date of this Contract and the Closing:

**Section 10.01.** From the date hereof until the date of Closing, Seller shall not withdraw or apply any security deposit unless the tenant has vacated the demised premises.

**Section 10.02.** Seller shall not modify or amend any Service Contract or enter into any new service contract unless the same is terminable without penalty by the then owner of the Premises upon not more than thirty days' notice.

**Section 10.03.** Seller or anyone acting on its behalf shall not enter into any contract or agreement (including, but not limited to any option agreement) to sell or lease all or any part of the Premises to any other person or entity.

**Section 10.04.** No fixtures, equipment or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

**Section 10.05.** Between the date hereof and the Closing Date Seller shall, for the sole purpose of facilitating the transfer of ownership of the Premises following the Closing, allow Purchaser or Purchaser's Representatives access to the Premises upon reasonable prior notice at reasonable times provided (a) such access does not interfere with the operation of the Premises or the rights of tenants: (b) Purchaser shall not contact any tenant without Seller's prior written consent; and (c) Purchaser shall not be permitted to perform any further testing or other physical evaluation of the Premises prior to Closing. Prior to such time as Purchaser or any of Purchaser's Representatives enter the Premises, Purchaser shall (i) obtain policies of general liability insurance which insure Purchaser, its agents and representatives with liability insurance limits of not less than $1,000,000 combined single limit for personal injury and property damage and name Seller and Seller's property manager as additional insureds and which are with such insurance companies, provide such coverage and carry such other limits as Seller shall reasonably require, and (ii) provide Seller with certificates of insurance evidencing that Purchaser has obtained the aforementioned policies of insurance.

**Section 10.06.** Seller shall not hire any additional or replacement employees, unless it is essential to the maintenance of the Premises. Seller represents and warrants to Purchaser that the Premises is not a union Premises, that no employee has an employment contract, and that no employees have unionized or attempted to unionize.

**Section 10.07.** Seller shall give Purchaser written notice of any action or proceeding that is commenced with respect to the Premises other than any action started in the ordinary course of business to collect rent or any action covered by Seller's existing liability insurance.

**Section 10.08.** Seller shall keep and maintain in force and effect all current insurance on the Premises.

**Section 10.09.** Seller shall use best efforts to obtain an estoppel certificate from tenants 736 Broadway Jewelry, Inc., Alfonso Rufolo and Foot Locker in the form attached hereto as Schedule "E". In the event Seller is unable to obtain said estoppel certificate, Mordechai Muschel shall provide an Owner's certificate attesting to the same facts as provided for in the estoppel certificate and shall personally guarantee payment to Purchaser for any damages resulting from any misrepresentation in the Owner's certificate provided that Purchaser has notified Seller of the misrepresentation within seven months of the Closing Date.

Section 10.10. Seller shall not enter into any new Lease or extend the term of any existing Lease with any person or entity for any part of the Premises. The foregoing covenant of Seller in this Section 10.10 shall apply only to the rental units set forth in the annexed Schedule "D".


## SECTION 11.　　SELLER'S CLOSING OBLIGATIONS

At the Closing, Seller shall deliver the following to Purchaser:

Section 11.01. A statutory form of bargain and sale deed with covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this Contract. Seller may omit from the deed the recital of any or all of the "subject to" clauses herein contained and/or any other title exceptions, defects or objections which have been waived or consented to by Purchaser, but the same shall nevertheless survive the Closing.

Section 11.02. Originals of all Leases (to the extent available) initialed by Purchaser and all others in Seller's possession.

Section 11.03. A schedule of all cash security deposits held by Seller on the Closing Date and a credit to Purchaser in the amount of such security deposits in Seller's possession. Purchaser shall and agrees to defend, indemnify and hold Seller harmless from and against any loss, cost, damage or expense arising out of or in connection with the Security Deposits.

Section 11.04. A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

Section 11.05. Purposely Omitted.

Section 11.06. An assignment to Purchaser, without recourse or warranty, of all of the interest of Seller in those Service Contracts, warranties, licenses, certificates, permits and other authorizations and approvals relating to the ownership or operation of the Premises which are then in effect and are assignable by Seller and copies of all such documents.

Section 11.07. To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

Section 11.08. Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, charges, liens, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name and an affidavit that no work has been done on the Premises by the City of New York or any local municipality and that there has been no demand that any work be performed which would result in charges being levied by the New York City Department of Emergency Repairs.

**Section 11.09.** Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by Purchaser's title company, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof.

**Section 11.10.** To the extent they are then in Seller's possession, copies of current painting records. Seller shall make all other Building and tenant files and records available to Purchaser for copying, which obligation shall survive the Closing.

**Section 11.11.** An original letter, executed by Seller or by its agent, advising the tenants of the sale of the Premises and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct.

**Section 11.12.** Such proof of Seller's right, power and authority to sell the Premises to Purchaser on the terms and conditions of this Contract as the Title Company shall reasonably require.

**Section 11.13.** A certification that Seller is not a "foreign person" as such term is used in Section 1445 of the Internal Revenue Code properly completed in the form required to satisfy Internal Revenue Service requirements to relieve Purchaser of any withholding requirement.

**Section 11.14.** A bill of sale conveying to Purchaser all the Personal Property owned by Seller, free and clear of all liens and encumbrances.

**Section 11.15.** An assignment to Purchaser, without recourse or warranty, of all of the interest of Seller in the Leases, provided Purchaser shall agree to assume all of lessor's interest under each Lease from the date of Closing and shall indemnify Seller against any loss or liability (including, without limitation, reasonable attorney's fees and disbursements) which arises out of Purchaser's failure to perform its obligations as lessor under any Lease after the date of the Closing. In the event Seller fails to deliver estoppel certificates in accordance with Seller's obligation set forth in Section 10.09 above, and Purchaser elects to proceed to Closing, Seller shall indemnify Purchaser against any loss or liability (including, without limitation, reasonable attorneys' fees and disbursements) which arises out of Seller's failure to perform its obligations as lessor under any Lease prior to the date of the Closing.

**Section 11.16.** Possession of the Premises in the condition required by this Contract, subject to the Leases and statutory tenancies, if any, and keys therefor.

**Section 11.17.** Intentionally omitted.

**Section 11.18.** Any other documents required by this Contract to be delivered by Seller or which may be reasonably required to satisfy Seller's obligations under this Contract.

**Section 11.19** At Closing, Seller shall execute and deliver "bring down" certificates to the effect that all representations and warranties made in this Agreement, including those set forth in Section 4 above, remain true and correct in all respects with the same effect as if then made.

### SECTION 12.        PURCHASER'S CLOSING OBLIGATIONS

At the Closing, Purchaser shall:

**Section 12.01.** Deliver to Seller payment of the portion of the Purchase Price payable at the Closing in accordance with Section 2.02 hereof, as adjusted for apportionments under Section 13 hereof.

**Section 12.02.** Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under Section 11.03.

**Section 12.03.** Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause all such returns and Seller's checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

**Section 12.04.** Deliver any other documents required by this Contract to be delivered by Purchaser.

**Section 12.05** At Closing, Purchaser shall execute and deliver "bring down" certificates to the effect that all representations and warranties made in this Agreement, including those set forth in Section 5 above, remain true and correct in all respects with the same effect as if then made.

**Section 12.06** At Closing, Purchaser shall deliver a Stipulation of Discontinuance for the action with prejudice titled Gary Barnett v. Mordechai Muschel, Index No. 601823/2009 executed by counsel for the Plaintiff (Sup. Ct., New York Co.) and releasing any further personal claims against Mordechai Muschel not pertaining to this Contract.

### SECTION 13.        APPORTIONMENTS AT THE CLOSING

**Section 13.01.** The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a)    prepaid rents except with regard to the third floor tenant at 736 Broadway which Purchaser hereby waives;

(b)    real estate taxes, water charges, sewer rents and vault charges, if any, on the basis of the fiscal period for which assessed. Seller shall not be responsible to pay or adjust for water and sewer charges due by any commercial tenant. If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed;

(c)    prepaid or accrued employee obligations, including but not limited to withholding, social security, unemployment, wages, health benefits and vacation pay, of

all persons employed at the Premises whose employment was not terminated at or prior to the Closing;

    (d)    value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes on the basis of an actual reading to be furnished by Seller's supplier within three days prior to the Closing;

    (e)    charges under transferable Service Contracts or permitted renewals or replacements thereof which Purchaser opts to assume (Purchaser hereby agrees to assume such Service Contracts described on Schedule "I" as are not cancelable by Seller upon thirty (30) days prior to written notice);

    (f)    permitted administrative charges, if any, on tenants' security deposits;

    (g)    Reletting Expenses under Section 7.02, if any;

    (h)    periodically recurring governmental fees for transferable licenses or permits issued in respect of the Premises for the use of any part thereof, if assignable and to the extent assigned;

    (i)    dues to rent stabilization associations, if any;

    (j)    any other customary adjustments made in connection with the sale of similar type buildings.

Except as otherwise expressly provided in this Contract, the customs of The Real Estate Board of New York, Inc. with respect to title closings, in effect as of the date hereof, shall apply to the apportionments and other matters herein mentioned. In the event any adjustments are miscalculated at the Closing, such error shall be promptly corrected after the Closing. The provisions of this Section shall survive the Closing for a period of three (3) months.

    **Section 13.02.** If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority: (a) first to the month in which the Closing occurred; (b) then to any month or months following the month in which the Closing occurred; and (c) then to the period prior to the month in which the Closing occurred. If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other party, which obligation shall survive the Closing.

    **Section 13.02** Seller hereby directs that at Closing, Purchaser shall pay $2,161,011 of the Purchase Price to the Beth Din Tzedek of America – Ein Moshe.

## SECTION 14.   OBJECTIONS TO TITLE AND FAILURE OF SELLER TO PERFORM

    **Section 14.01.** Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney within twenty (20) days after the date hereof. Purchaser shall cause a copy of all title updates to be forwarded to Seller's

attorney upon receipt. Purchaser further agrees that it will within ten (10) days after its receipt of the title report advise Seller's attorneys in writing of any exceptions to title to the Premises not set forth in Section 1.02 above as to which Purchaser believes it is not required to take title "subject to." Seller shall be entitled to a reasonable adjournment or adjournments of the Closing for up to 60 days to remove any defects in or objections to title noted in such title report or title update and any other defects or objections which may be disclosed on or prior to the Closing Date. Any action taken by Seller to remove such objections shall not be deemed an admission on Seller's part that such objection is one which would give Purchaser the right to terminate this Contract. Any exception appearing in a title report or any continuation thereof which is not objected to by Purchaser prior to the Closing Date, as provided herein, shall be deemed waived, unless such exception first appears in a title continuation delivered by the title company at the Closing.

**Section 14.02.** If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this Contract, Purchaser nevertheless, may elect to accept such title as Seller may be able to convey without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Seller may terminate this Contract and refund the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest accrued thereon to Purchaser. Upon such refund and reimbursement, this Contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability, other than any arising under Section 19 hereof except that Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a hard money lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing . Seller shall not be required to bring any action or proceeding or to incur any expense in excess of $600,000 in respect of any and all properties comprising the Premises (which sum shall include any sum expended by Seller under Section 8 hereof) to cure any title defect or to enable Seller otherwise to comply with the provisions of this Contract, but the foregoing shall not permit Seller to refuse to pay off at the Closing, to the extent of the monies payable at the Closing, mortgages on the Premises, of which Seller has actual knowledge, which are not being assumed by Purchaser.

**Section 14.03.** Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than three days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any such liens and encumbrances of record. Upon request made a reasonable time

before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with Section 2.02. If Purchaser's title insurance company is willing to insure Purchaser that such charges, liens and encumbrances will not be collected out of or enforced against the Premises and omit same from Purchaser's lender's title policy, then Seller shall have the right in lieu of payment and discharge to deposit with the title insurance company such funds or assurances or to pay such special or additional premiums as the title insurance company may require in order to so insure and omit. In such case, the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

## SECTION 15.        TAX REDUCTION PROCEEDINGS

**Section 15.01.** If Seller has heretofore filed applications for the reduction of the assessed valuation of the Premises and/or instituted certiorari proceedings to review such assessed valuations for any prior tax years, Purchaser acknowledges and agrees that Seller shall have sole control of such proceedings, including the right to withdraw, compromise and/or settle the same or cause the same to be brought on for trial and to take, conduct, withdraw and/or settle appeals, and Purchaser hereby consents to such actions as Seller may take herein. Seller shall not withdraw, compromise or settle any such proceedings for any fiscal period in which the Closing is to occur without the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Any refund or the savings for any year or years prior to the tax year in which the Closing herein occurs shall belong solely to Seller. Any tax savings or refund for the tax year in which the closing occurs shall be prorated between Seller and Purchaser after proportionate deduction of attorneys' fees and other expenses related to the proceeding. Each party hereto shall execute all consents, receipts, instruments and documents which may reasonably be requested by the other party in order to facilitate settling the above proceedings and collecting the amount of any refund or tax savings. Seller, at Purchaser's sole expense, shall cooperate with Purchaser to file any new tax certiorari proceedings. The provisions of this Section 15 shall survive the Closing.

## SECTION 16.        DEFAULT

**Section 16.01.** If Purchaser shall default in the payment of the Purchase Price on the Closing Date, Seller may terminate this Contract. Purchaser acknowledges that if Purchaser shall so default under this Contract, Seller will suffer substantial adverse financial consequences as a result thereof. Accordingly, Seller, as its sole remedy, shall have the right to retain the Contract Deposit and accrued interest on such amount and the Barnett Loan shall be deemed satisfied and paid by Mordechai Muschel as and for liquidated damages, it being agreed that Seller's damages will be difficult, if not impossible, to ascertain, in which event, after the delivery of the balance of the Contract Deposit, including any additional sums paid pursuant to Section 3.01 of this Contract, to Purchaser, Purchaser and Seller shall have no further rights or obligations under this Contract, except those expressly provided herein to survive the termination of this Contract. Seller shall have no obligation on its part to tender a deed for the Premises to Purchaser prior to pursuing any of the remedies available to Seller set forth above.

**Section 16.02.** If Seller shall default hereunder for any reason, Purchaser, as its remedy, shall either have the right (a) in lieu of prosecuting an action for damages or proceeding with any other legal or equitable course of conduct, including, without limitation, any action for

specific performance, to terminate this Contract whereupon Seller shall return to Purchaser the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a hard money lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing.. Upon receipt of the foregoing by Purchaser, Purchaser and Seller shall have no further rights or obligations under this Contract, except those expressly provided herein to survive the termination of this Contract, or (b) in lieu of prosecuting an action for damages or proceeding with any other legal or equitable course of conduct, to seek specific performance of this Contract. In the event Purchaser prosecutes an action or proceeding for specific performance and such action of proceeding results in a judgment in favor of Purchaser, Seller shall indemnify and reimburse Purchaser for Purchaser's reasonable counsel fees (including disbursements, penalties and interest accrued) and all other actual expenses resulting from or made necessary by the bringing of such action or proceeding. In the event Purchaser prosecutes an action or proceeding for specific performance and such action of proceeding results in a judgment in favor of Seller, Purchaser shall indemnify and reimburse Seller for Seller's reasonable counsel fees (including disbursements, penalties and interest accrued) and all other actual expenses resulting from or made necessary by the bringing of such action or proceeding. Notwithstanding anything in this Contract to the contrary, in the event of default by Seller for any reason, Purchaser shall have the right to receive the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, together with any interest earned thereon, and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a hard money lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing .

## SECTION 17. LIMITATIONS ON SURVIVAL OF REPRESENTA-TIONS, WARRANTIES, COVENANTS AND OTHER OBLIGATIONS

**Section 17.01.** Except as otherwise provided in this Contract, no representations, warranties, covenants or other obligations of Seller set forth in this Contract shall survive the

Closing, and no action based thereon shall be commenced after the Closing. Seller shall not have any liability if a representation or warranty contained herein is untrue, inaccurate or incorrect to the extent that this Contract, any documents delivered to Purchaser in connection herewith, Purchaser's own due diligence investigations or any estoppel certificate executed by any tenant of the Premises and delivered to Purchaser or any of Purchaser's Representatives contains information which is inconsistent with such representation or warranty.

**Section 17.02.** The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this Contract to survive the Closing.

### SECTION 18. PURPOSELY OMITTED

### SECTION 19. BROKER

**Section 19.01.** Seller and Purchaser mutually represent and warrant that there is no broker with whom they have dealt in connection with this Contract other than Moshe Majeski (the "Broker") and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to claim a commission in connection with this transaction. Seller and Purchaser shall pay the Broker at closing subject to separate agreements. Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representations, warranties or agreements contained in this Section. The representations and obligations under this Section shall survive the Closing or, if the Closing does not occur, the termination of this Contract.

### SECTION 20. NOTICES

**Section 20.01.** All demands, requests or other communications (collectively, "Notices") required to be given or which may be given hereunder shall be in writing and shall be sent by (a) certified or registered mail, return receipt requested, postage prepaid, or (b) national prepaid overnight delivery service, or (c) personal delivery with receipt acknowledged in writing, or (d) if not relating to default, termination or distribution of monies, by telecopier with confirmation of receipt, directed to:

If to Seller:  c\o Mordechai Muschel
108 Lafayette Avenue, Passaic, New Jersey 07055

with a copy to:            Yaron Kornblum, Esq.
Rivkin Radler LLP
926 RexCorp Plaza
Uniondale, New York 11556-0111
Telephone No.: (516) 357-3082
Facsimile No: (516) 357-3333
yaron.kornblum@rivkin.com

If to Purchaser:       Extell Development Company
805 Third Avenue
New York, New York 10022

with a copy to:            Franklyn H. Snitow , Esq.
Snitow  Kanfer  Holtzer & Millus LLP
575 Lexington Avenue
New York, NY 10022-6102
Phone (212) 317-8500
Fax (212) 317-1308

Any notice so sent by certified or registered mail shall be deemed given two days after mailing. All other notices shall be deemed given when actually received or refused by the party to whom the same is directed.  A notice may be given by a party or by such party's attorney.  Both Seller and Purchaser may designate, by not less than five (5) business days notice given to the other in accordance with the terms of this Section 20, substituted parties to whom, and/or addresses to which, notices should be sent hereunder.  All notices necessary or required under this Contract may be sent by facsimile or electronic mail.

### SECTION 21.        INTENTIONALLY DELETED

### SECTION 22.        ASSIGNMENT

**Section 22.01.**  Neither the Purchaser's interest under this Contract nor any portion thereof may be assigned by Purchaser, except with Seller's prior written consent, which consent Seller may arbitrarily or unreasonably withheld or delayed.  Any attempt at such assignment without first obtaining such consent shall be null and void and of no force and effect and shall be deemed to be a material breach of this Contract by Purchaser.  Notwithstanding anything to the contrary in this paragraph, Purchaser, upon notice to Seller, shall be permitted to assign this Contract to an LLC in which Gary Barnett has a twenty five (25%) percent ownership and controlling interest.  Any permitted assignment of this Contract by Purchaser shall not relieve Purchaser from any of its liabilities under this Contract.

### SECTION 23.        PURPOSELY OMITTED

**SECTION 24.**  **PURPOSELY OMITTED**

**SECTION 25.**  **MISCELLANEOUS**

**Section 25.01.** Purchaser shall not record this Contract and any attempt to record the same shall be a material default by Purchaser thereunder and thereupon, at the option of Seller, this Contract shall be deemed cancelled and Seller shall have any and all remedies for a default by Purchaser as provided herein or by law.

**Section 25.02.** Whether or not the transactions contemplated under this Contract are consummated, each party hereto shall pay its own expenses incident to the preparation and performance of this Contract including, without limitation, attorneys' fees, consultant's fees, etc.

**Section 25.03.** Each party hereby acknowledges that it has been represented by counsel of its own choosing.

**Section 25.04.** If the superintendent or any other employee of the seller occupies an apartment and/or other space for living quarters in the basement or ground floor of the aforesaid premises and such use and occupancy of such apartment or such other space violates any law, ordinance, rule and/or regulation of any municipal, state or other governmental department, authority, commission, agency or board, such use and occupancy shall not be deemed such a violation which has to be removed by the seller pursuant to the terms of this contract, nor shall such use or occupancy be any objection to title and the purchaser agrees to take title subject to such use and occupancy. At closing, Seller shall provide Purchaser with a letter terminating the superintendant.

**Section 25.05.** The Purchaser agrees that no allowance shall be made to it because of the fact that the refrigerators and/or gas ranges are the property of the tenants in the building, even though the registrations for the said apartment may state that the refrigerators and/or gas ranges are services to be supplied by the owner of the building. .

**Section 25.06.** At the closing, Seller shall receive all real estate tax credits for senior citizens for the period for which Seller remains entitled. Any portion of such real estate tax adjustments which Seller has not received fully at the time of the closing shall be computed at the time of closing, and the Seller shall receive a credit for the amount that Seller is entitled to for this item.

**Section 25.07.** Purchaser hereby waives the right to have a risk assessment or inspection for lead-based paint and/or lead-based paint hazards and agrees to take the Premises "as is" with respect to lead-based paint and/or lead-based paint hazards.

**Section 25.08.** In the event that either Purchaser or Seller commences any action or proceeding with respect to this Contract or the rights of the parties thereunder, the prevailing party shall be entitled to recover from the other party, the reasonable attorney's fees and disbursements incurred by such prevailing party. The provisions of this paragraph 25.08 shall survive the Closing or the earlier termination of this Contract

**Section 25.09.** This Contract, being drawn, negotiated and executed in the State of New York, pertaining solely to property situated in the State of New York, shall be interpreted and governed by the laws of the State of New York, without regard to the choice of law provisions of such State.

**Section 25.10.** EACH PARTY HERETO HEREBY KNOWINGLY, IRREVOCABLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THIS CONTRACT, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS CONTRACT OR THE TRANSACTIONS CONTEMPLATED HEREIN, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH PARTY TO ACCEPT THIS CONTRACT. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS CONTRACT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS CONTRACT, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS CONTRACT, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS CONTRACT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**Section 25.11.** The provisions of this Contract are intended to be solely for the benefit of the parties hereto, and the execution and delivery of this Contract shall not be deemed to confer any rights upon, nor obligate any of the parties hereunder, to any person or entity other than the parties hereto.

**Section 25.12.** This Contract is not an offer by either party, and it shall not have any binding effect unless and until Purchaser and Seller shall have both executed same and fully executed copies thereof have been delivered to Seller and Purchaser, or their respective attorneys.

**Section 25.13.** This Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract.

**Section 25.14.** No failure or delay of either party in the exercise of any right given to such party hereunder or the waiver by any party of any condition hereunder for its benefit (unless the time specified herein for exercise of such right, or satisfaction of such condition, has expired) shall constitute a waiver of any other or further right, nor shall any single or partial exercise of any right preclude other or further exercise thereof. The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

**Section 25.15.** This Contract may not be changed or terminated orally or in any manner, other than by written agreement executed by Seller and Purchaser or their attorneys.

**Section 25.16.** Subject to the provisions of Section 22 hereof, the provisions of this Contract shall extend, bind and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

**Section 25.17.** If any provision of this Contract as applied to either party or to any circumstance shall be adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, the same shall in no way affect, to the maximum extent permitted by law, any other provisions of this Contract, the application of any such other provision under circumstances different from those adjudicated by the court, or the validity or enforceability of this Contract as a whole.

**Section 25.18.** This Contract may be executed in any number of counterparts, each of which shall be an original with the same force and effect as if the signature thereto and hereto were upon the same instrument. Signatures transmitted by fax or electronic mail shall be valid and binding.

**Section 25.19.** As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the case may require.

**Section 25.20.** The captions of this Contract are inserted for convenience of reference and in no way define, describe or limit the scope or intent of this Contract or any of the provisions hereof.

**Section 25.21.** All Schedules attached to this Contract are incorporated into this Contract by reference as if fully set forth herein.

**Section 25.22.** This Contract shall be construed without regard to or aid of canons requiring construction against the party drawing this Contract.

**Section 25.23** Mordechai Muschel's personal liability shall be limited to Sections 4.06 and 19.01 of this Contract. Nothing provided for herein shall be construed to limit Seller's obligations as provided for in this Contract.

## SECTION 26. SECTION 1031 TAX FREE EXCHANGE

Seller has informed Purchaser that it shall seek in full or partial payment of the Purchase Price like-kind property for the purpose of effectuating an exchange pursuant to Section 1031 of the Internal Revenue Code, and the regulations promulgated thereunder. To facilitate such exchange, and as a material inducement to Seller to enter into this Contract and at no cost, expense or liability to Purchasers, Purchaser consents (i) to an assignment by Seller of this Contract or of any of Seller's rights hereunder, including the right to receive all or any portion of the Purchase Price, to a Qualified Intermediary (as defined in

Treasury Regulations Section 1.1031(k)-1(g)(4)) and (ii) to take such other actions as are reasonably necessary to facilitate such like-kind exchange, which shall in no event involve Purchaser acquiring title to or owning any replacement property on behalf of the Seller or incurring any expenses or liability (unless such expenses or liability are reimbursed to Purchaser by Seller). Purchaser agrees to reasonably cooperate with Seller in effectuating the like-kind exchange and to execute all documents reasonably necessary in connection therewith. In the event of a like-kind exchange, on the Closing Date, at the direction of the Qualified Intermediary (a) Seller shall convey title to the Premises to Purchaser, (b) Purchaser shall pay the balance of the Purchase Price (or the portion so assigned) to the Qualified Intermediary or its designee, and (c) Purchaser shall execute such documents as may be reasonably necessary to acknowledge the exchange. The Qualified Intermediary shall have the right to direct the payment of the balance of the Purchase Price to separate accounts and/or different persons and Purchaser agrees to comply with such direction from the Qualified Intermediary. Seller agrees to indemnify and hold purchaser free and harmless from any cost, expense or liability, including reasonable attorney's fees, resulting from Seller's participation in such exchange.

(b)     Purchaser reserves the right to include this transaction as part of an IRC Section 1031 tax deferred exchange for the benefit of Purchaser, at no cost, expenses or liability to Seller. Seller agrees to execute any and all documents (subject to the reasonable approval of Seller's counsel) as are reasonably necessary in connection therewith, provided that the close of escrow for the conveyance of Seller's property shall not be contingent upon or subject to the completion of such exchange, Purchaser agrees to indemnify and hold Seller free and harmless from any cost, expense or liability, including reasonable attorney's fees, resulting from Seller's participation in such exchange.

Section 27          **DISCONTINUANCE OF BANKRUPTCY ACTION**

This Contract shall be submitted to the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") for its approval of (a) this Contract and (b) the stipulation executed concurrently herewith and attached hereto as Schedule "G" providing for, among other things, (i) the dismissal of the Bram Will-El, LLC and William Muschel, LLC bankruptcy proceedings bearing Case Nos. 06-01788 and 06-01790, respectively, (ii) the dismissal, with prejudice, of the adversary proceedings pending in the United States Bankruptcy Court for the Southern District of New York entitled *Broadwall America, Inc. v. Bram Will-El, LLC and William Muschel, LLC* bearing Case Nos. 06-01788,06-01799 and 06-01790, and (iii) the waiver of any claim by Broadwall America, Inc to purchase the properties which are the subject of this Contract or any rights whatsoever under that certain contract between Broadwall America, Inc. and Bram Will-El, LLC and William Muschel, LLC, dated August 7, 2002. Nothing contained herein shall impair, prejudice or otherwise affect such rights, claims and defenses including such claims now asserted by Seller in a certain state court action entitled *Bram Wil-El LLC, et. al v. Extreme Realty, LLC, et. al, case no. 12667/07, Supreme Court of the State of New York, Kings County* none of which rights shall be impaired or affected under this Contract. Both parties shall fully cooperate in obtaining the aforementioned approval of the Bankruptcy Court. The aforesaid requirement that the Contract be approved by the Bankruptcy Court shall be deemed satisfied if the Bankruptcy Court so-orders the stipulation annexed as Schedule "G". In the event the Bankruptcy Court does not approve this Contract by issuing an

order or written communication indicating that it is refusing to approve this Contract, this Contract shall be null and void and of no further force and effect and neither party shall have any further claims against the other party, except that Seller shall return the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, to Purchaser and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a hard money lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the day and year first above written.

SELLERS:
Bram Will-El, LLC

Mordechai Muschel

SELLERS:
WILLIAM MUSCHEL, LLC

Mordechai Muschel

SELLERS:

MORDECHAI MUSCHEL

PURCHASER:

## SCHEDULE "A"

## LEGAL DESCRIPTION

## SCHEDULE "B'

## LITIGATION PENDING AGAINST SELLER

## SCHEDULE "C"

### RENT ROLL

## SCHEDULE "D"

# SCHEDULE "E"

## FORM OF ESTOPPEL CERTIFICATE

# SCHEDULE "F"

## ASSUMED SERVICE CONTRACTS

# SCHEDULE "G"

# BANKRUPTCY STIPULATIONS

EXHIBIT 2

# CONTRACT OF SALE

CONTRACT (this "Contract"), dated the 4th day of August, 2010 by and between, BRAM WILL EL, LLC, WILLIAM MUSCHEL, LLC and MORDECHAI MUSCHEL (collectively and individually referred to as "Seller"), with a mailing address at c\o Rivkin Radler LLP, 926 RXR Plaza, Uniondale, New York 11556, (the "Seller") and Extell Development Company, a Missouri Corporation, with a mailing address at 805 Third Avenue, New York, New York 10022 (the "Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

## SECTION 1.  SALE OF PREMISES AND ACCEPTABLE TITLE

**Section 1.01.**  Seller shall sell to Purchaser and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this Contract, all of the following (being hereinafter collectively called the "Premises"):

(a)  the parcels of land described on Schedule "A" attached hereto (collectively the "Land") located in the County of New York, the City of New York and the State of New York, designated as Blocks 545, lots 21 & 22, on the New York County Tax Map and known as and by the following address 734 & 736 Broadway, New York, New York 10003.

(b)  all buildings and improvements situated on the Land (collectively, the "Building");

(c)  all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway;

(d)  the appurtenances and all of the estate and rights of Seller in and to the Land and the Building;

(e)  all air rights and/or other development rights relating in any way to the Land and/or the Building and/or the Premises; and

(f)  all right, title and interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Building (collectively, the "Personal Property").  Seller and Purchaser agree that all fixtures, equipment and other items of personal property owned by any person or firm presently or hereafter occupying the Building are expressly excluded from the Personal Property and are not intended to be conveyed by Seller to Purchaser or acquired by Purchaser from Seller.

**Section 1.02.**  Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this Contract, subject only to the following matters (collectively, the "Permitted Exceptions"):

(a)   any state of facts any Survey or physical inspection of the Premises may show provided same do not render title to the Premises uninsurable;

(b)   covenants, restrictions, easements and party wall reservations, and agreements of record, if any, provided same are not violated by the Building or the use thereof;

(c)   encroachments or projections upon any street or road of areas, grating, steps, windows, balconies, ornamental stone, tile, brick, eaves, trim and cornices provided such facts do not render title to the Premises uninsurable;

(d)   variations, if any, between fences, retaining walls and record lines, provided such variations do not render title to the Premises uninsurable without payment of additional title insurance premium provided same are not violated by improvements and the Buildings;

(e)   rights, if any, of the city, town or village in which the Premises lie with respect to vaults under the sidewalk beyond the building line provided that all fees to said municipalities are paid;

(f)   consents of record by Seller or any former owner of the Premises in favor of any governmental authority for the erection of any structure, or structures, on, under and above any streets or roads in front of or adjoining the Premises provided same do not prevent access to or from the Premises;

(g)   zoning regulations and ordinances of the city, town or village in which the Premises lie, which are not violated by the Building or the use thereof;

(h)   except as otherwise set forth in Section 8 hereof, all notes or notices of violations of law or municipal ordinances, orders or requirements noted in or issued by the Departments of Housing and Buildings, Fire, Labor, Health, or other State or Municipal Departments having jurisdiction against or affecting the Premises. Notwithstanding anything to the contrary in this Section 1.02(h), at Closing, Seller shall pay all fines, penalties and liens associated with any violations (except for any violations regarding the lack of a certificate of occupancy or work needed to be done to cure same which are issued after the date this contract becomes effective pursuant to Section 27 and up to $25,000 and any sums beyond $25,000 shall be the responsibility of Seller. Any violations issued after ninety days from the Effective Date of this Contract shall be the responsibility of Purchaser provided the contract becomes effective pursuant to Section 27), but Seller shall not be obligated to remove them from the record prior to or at the Closing.

(i)   all leases or tenancies now affecting the Premises and any new leases or tenancies not prohibited by this Contract;

(j)   financing statements, chattel mortgages and liens on personalty filed more than five (5) years prior to the Closing Date (as hereinafter defined) and not renewed, or

filed against property or equipment no longer located on the Premises or owned by tenants;

(k)     the standard printed exceptions contained in any certificate of title or title policy issued to Purchaser by any title company authorized to issue title insurance in the State of New York;

(l)     such other matters as any reputable title insurance company shall be willing, without special premium, to except with insurance against collection out of or enforcement against the Premises as to the fee;

(m)     the lien of taxes and assessments not yet due and payable (it being agreed by Purchaser and Seller that if any tax or assessment is levied or assessed with respect to the Premises after the date hereof and the owner of the Premises has the election to pay such tax or assessment either immediately or under a payment plan with interest, Seller may elect to pay under a payment plan, which election shall be binding on Purchase);

(n)     any exceptions caused by Purchaser, its agents, representatives or employees;

(o)     Notice of sidewalk violations, if any.

(p)     Any open permits and\or the lack of a valid certificate of occupancy for the Premises.

(r)     Boundary Line Agreement found in Liber 4449, page 354 (affects lot 22)

## SECTION 2. PURCHASE PRICE AND ACCEPTABLE FUNDS

**Section 2.01.**  The purchase price (the "Purchase Price") to be paid by Purchaser to Seller for the Premises shall be ELEVEN MILLION ($11,000,000) DOLLARS, which shall be paid as follows:

(a)     On the signing of this Contract, TWO HUNDRED  FIFTY THOUSAND ($250,000) DOLLARS, by check subject to collection or by wire transfer to Mordechai Muschel or his designee(the "Contract Deposit");

(b)     On the Closing date, as hereinafter defined, pursuant to the terms of this Contract Seller shall be credited SEVEN HUNDRED FIFTY THOUSAND ($750,000) DOLLARS, as full satisfaction of a $750,000 loan made by Gary Barnett  to Mordechai Muschel ("the Barnett Loan") which is currently due and outstanding;

(c)     TEN MILLION ($10,000,000) DOLLARS on the Closing Date (subject to adjustment pursuant to the terms of this Contract) in accordance with the provisions of Section 2.02 hereof.

If the check representing the Contract Deposit fails due collection, unless Purchaser replaces such check with good funds in accordance with Section 2.02 hereof within three (3) business days after written notice to Purchaser, Seller may, at its option, declare this Contract null, void

and of no force and effect and may pursue its remedies against the Purchaser for liquidated damages in the amount of $15,000.00 plus the cost and expense, including reasonable attorney's fees, of any action or proceeding associated therewith.

**Section 2.02.** All monies payable under this Contract, unless otherwise specified in this Contract, shall be paid by:

(a)    certified checks of Purchaser or any person or entity making an investment in or gift or purchase money loan to Purchaser drawn on any bank, savings bank, trust company or savings and loan association and having a banking office in the State of New York and payable directly to the order of Seller; or

(b)    official bank checks drawn by any such banking institution payable directly to the order of Seller; or

(c)    wire transfer to an account designated by Seller on the Closing Date.

In all cases, Seller shall provide purchaser with a list of the names and payees of the checks or wire transfers (and, in the case of wire transfers, wiring instructions) at least two (2) business days before the Closing.

**Section 2.03.** Except for the Contract Deposit, all monies payable under this Contract, unless otherwise specified in this Contract, shall be paid by:

(a)    certified checks of Purchaser or any person or entity making an investment in or gift or purchase money loan to Purchaser drawn on any bank, savings bank, trust company or savings and loan association and having a banking office in the State of New Jersey and payable directly to the order of Seller; or

(b)    official bank checks drawn by any such banking institution payable directly to the order of Seller; or

(c)    wire transfer to an account designated by Seller on the Closing Date.

**Section 2.04.** Intentionally Omitted.

**Section 2.05.** No portion of the Purchase Price is attributable to the Personal Property included in the sale of the Premises to Purchaser.

**Section 2.06.** The parties agree that the purchase price for the Premises shall be allocated as follows: 734 Broadway $4,500,000 and 736 Broadway $$6,500,000 subject to reallocation as agreed to by the parties.

## SECTION 3. CLOSING

**Section 3.01.** Except as otherwise provided in this Contract, the closing of title pursuant to this Contract (the "Closing") shall take place ninety (90) days from the date of

execution and delivery of the contract to Purchaser (the "Execution Date") except that upon written notice to Seller on or before seventy five (75) days after the Execution Date and tender by Purchaser of an additional $150,000 to Seller, $110,00 which shall be credited toward the Purchase Price, the Closing shall take place one hundred fifty days (150) days from the Execution Date or sixty (60) days from the issuance of the Bankruptcy Court Order allowing the sale to proceed or dismissing the existing bankruptcy case; whichever occurs later (such date and any date the Closing is adjourned to being herein referred to as the "Closing Date") at the offices of Rivkin Radler LLP, 926 RXR Plaza, Uniondale, New York 11556-0111, or at such offices as may be designated within the County of Nassau or the City of New York by Purchaser's lender. Time shall be of the essence as to the Closing Date. If the Closing Date shall not be a business day under the laws of the State of New York, the Closing shall occur on the next business day after the Closing Date. The attorneys for the parties are hereby authorized to agree in writing upon adjournments of the Closing Date. In the event Purchaser tenders the additional $150,000 provided for herein, Seller shall execute a new Confession of Judgment and Guaranty for an additional $110,000 which shall be held in escrow and released in accordance with Sections 9, 14, 16 and 27.

## SECTION 4. REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser to the knowledge of its Designated Employees (as defined in Section 4.04) as of the date hereof and as of the Closing Date as follows:

**Section 4.01.** Seller represents and warrants to Purchaser that he has the requisite power and authority to convey the Premises to Purchaser in accordance with the terms of this Contract. Seller further represents and warrants to Purchaser that (a) Seller shall be the sole owner of the Premises; (b) the Premises shall be delivered to Purchaser at Closing free and clear of all liens or encumbrances subject only to the Permitted Exceptions; (c) Seller or anyone acting on his behalf has not sold, leased or entered into any contact or agreement to sell or lease unless as set forth herein all or any part of the Premises to any person or entity other than Purchaser; and (d) there is no litigation pending or threatened against Seller which would affect Seller's obligation to deliver clear title to the Premises to Purchaser at Closing except as set forth on the schedule of Litigation and Claims annexed hereto as Schedule "B".

**Section 4.02.** The information concerning written leases for space at the Property (which together with all amendments, modifications and extensions thereof are collectively referred to herein as the "Leases") and statutory tenancies, if any, set forth in Schedule "C" attached hereto (the "Rent Schedule") is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and there are no Leases of any space in the Building or statutory tenancies other than those set forth therein and there are no subleases or subtenancies. True and correct copies of all Leases and any amendments, modifications and extensions thereto have been scheduled to and initialed by Purchaser or its representative. The Leases are in full force and effect and none of them have been modified, amended or extended, except as otherwise provided on Schedule "C". Nothing contained in this Section 4.02 is intended (and shall not be construed) as a representation by Seller of the parties that are in actual possession of any portion of the Premises since there may be subtenants, licensees or assignees that are in possession of portions of the Premises of which Seller may not be aware. In addition, the Rent Schedule provided in Schedule "C" shall only be deemed to be materially inaccurate or incorrect if it is inaccurate or incorrect by more than 5% of the gross monthly income for the Premises as set forth therein. The rents set forth on Schedule "C" are being collected on a current basis, there

are no arrearages in excess of one month and there are no pre-paid rents other than as set forth on Schedule "C". There are no security deposits other than those set forth in Schedule "C". Seller's representations in this Section 4.02 shall only apply to the rental units set forth in the annexed Schedule "D".

**Section 4.03.** No tenant or no other party has the right to purchase the Premises or a right of first refusal or first offer with respect to a sale of the Premises. No renewal or extension option or options for additional space have been granted to tenants. No tenant is entitled to rental concessions or abatements outside of the lease. Seller's representations in this Section 4.03 shall only apply to the rental units set forth in the annexed Schedule "D".

**Section 4.04.** The Designated Employees of Seller are the individuals who have been primarily responsible for the management of the Premises on behalf of Seller for the three (3) year period immediately prior to the date hereof and are currently employed by Seller. Jacob Eisenstein of EK Realty shall be deemed the "Designated Employee" for the purposes of this Contract.

**Section 4.05** To the best of Seller's knowledge, no action or proceeding, voluntary or involuntary is pending against any commercial tenant under any bankruptcy or insolvency act. Seller has not sent written notice to any tenant claiming that such tenant is in default, which default remains uncured. Seller's representations in this Section 4.05 shall only apply to the rental units set forth in the annexed Schedule "D".

**Section 4.06** No leasing commissions are due or owing with respect to any of the Leases. Seller's representations in this Section 4.06 shall only apply to the rental units set forth in the annexed Schedule "D". Notwithstanding anything herein to the contrary, Mordechai Muschel agrees to defend, indemnify and hold Seller harmless from and against any and all claims, damages, losses, expenses, causes of action, suits, penalties, judgments, and/or liabilities, including reasonable attorneys' fees, arising out of or in connection with any claim for brokerage or leasing commissions with respect to any of the Leases.

**Section 4.07** Seller has entered into no service, maintenance, supply and management contracts ("Service Contracts") affecting the Premises that will be binding upon Seller after closing. Seller does not employ individuals who are unionized and no efforts have been made by Seller's employees to unionize.

**Section 4.08** Seller is not a "foreign person" as defined in Internal Revenue Code Section 1445 and regulations issued thereunder.

**Section 4.09** Except as set forth in Section 27 herein, Seller has taken all necessary action to authorize the execution, delivery and performance of this Contract and has the power and authority to execute, deliver and perform this Contract and consummate the transaction contemplated hereby.

**Section 4.10** Seller represents that the 5th floor of 734 Broadway, New York, New York , and the retail space on the first floor of 736 Broadway (collectively the "Vacant Space") are vacant, there are no leases affecting the Vacant Space, no options to lease the Vacant Space, and no other claims by any individual or entity to any rights of occupancy in the Vacant Space.

**Section 4.11**  Seller represents that neither Seller nor EK Realty have received notification from the tenant of the Fifth Floor in 736 Broadway, Alfonso Rufolo, regarding the amount of money paid by said tenant for improvements to tenant's unit as provided for in section R 14 of tenant's lease, dated May 8, 2009 with Seller.

**Section 4.12**  Each of the representations and warranties of Seller in this Section 4 and elsewhere in this Contract shall survive for a period of seven (7) months after Closing.  All indemnities by Seller in favor of Purchaser in this Contract shall survive for a period of seven (7) months after Closing.  Each of the representations and warranties made by Seller in this Contract shall be deemed restated and shall be true and accurate on the Closing Date.

## SECTION 5.  REPRESENTATIONS AND WARRANTIES OF PURCHASER

**Section 5.01.**  Purchaser has the requisite power and authority and the financial resources to purchase the Premises from Seller in accordance with the terms of this Contract.

## SECTION 6.  PURCHASER'S DUE DILIGENCE/CONDITION OF THE PREMISES

**Section 6.01.**  Purchaser acknowledges that prior to Purchaser's execution of this Contract:

(a)  Seller has made available to Purchaser and otherwise allowed Purchaser access to Documents (as defined in Section 6.04); and

(b)  Purchaser has conducted (or waived its right to conduct) all such Due Diligence (as defined in Section 6.04) with respect to the Premises as Purchaser considers necessary or appropriate.

Purchaser has reviewed, examined, evaluated and verified the results of its Due Diligence to the extent it deems necessary or appropriate with the assistance of such experts as Purchaser deemed appropriate.  In particular, Purchaser has determined to its satisfaction the assignability of any Documents to be assigned hereunder.  Purchaser acknowledges and agrees that it (x) is familiar with the physical condition of the Premises, (y) has completed its Due Diligence to its satisfaction, and (z) except for Seller's Warranties (as defined in Section 6.04), is acquiring the Premises based exclusively upon its own Due Diligence.

**Section 6.02.**  Except as provided herein, Purchaser acknowledges and agrees that (i) the Premises are being sold, and Purchaser shall accept possession of the Premises on the Closing Date, "AS IS, WHERE IS, WITH ALL FAULTS", with no right of setoff or reduction in the Purchase Price; (ii) except for Seller's Warranties, none of the Seller Parties (as defined in Section 6.04) have or shall be deemed to have made any verbal or written representations, warranties, promises or guarantees (whether express, implied, statutory or otherwise) to Purchaser with respect to the Premises, any matter set forth, contained or addressed in the Documents (including, but not limited to, the accuracy and completeness thereof) or the results of Purchaser's Due Diligence; and (iii) Purchaser has confirmed independently all information that it considers material to its purchase of the Premises or the transaction contemplated herein.

Purchaser specifically acknowledges that, except for Seller's Representations and Warranties set forth in Section 4 of this Contract, Purchaser is _not_ relying on (and Seller and each of the other Seller Parties does hereby disclaim and renounce) any representations or warranties of any kind or nature whatsoever, whether oral or written, express, implied, statutory or otherwise, from Seller or any other Seller Parties, as to: (1) the operation of the Premises or the income potential, uses, or the merchantability, habitability or fitness of any portion of the Premises for a particular purpose; (2) the physical condition of the Premises or the condition or safety of the Premises or any component thereof, including, but not limited to, plumbing, sewer, heating, ventilating and electrical systems, roofing, air conditioning, foundations, soils and geology, including Hazardous Materials, lot size, or suitability of the Premises or any component thereof for a particular purpose; (3) the presence or absence, location or scope of any Hazardous Materials in, at, about or under the Premises; (4) whether the appliances, if any, plumbing or utilities are in working order; (5) the habitability or suitability for occupancy of any structure and the quality of its construction; (6) whether the improvements are structurally sound, in good condition, or in compliance with applicable Laws; (7) the accuracy of any statements, calculations or conditions stated or set forth in Seller's books and records concerning the Premises or set forth in any of Seller's offering materials with respect to the Premises; (8) the dimensions of the Premises or the accuracy of any floor plans, square footage, lease abstracts, sketches, or revenue or expense projections related to the Premises; (9) the operating performance, the income and expenses of the Premises or the economic status of the Premises; (10) the ability of Purchaser to obtain any and all necessary governmental approvals or permits for Purchaser's intended use and development of the Premises; and (11) the leasing status of the Premises or the intentions of any parties with respect to the negotiation and/or execution of any lease for any portion of the Premises. Purchaser further acknowledges and agrees that, except for Seller's Warranties, Seller is under no duty to make any affirmative disclosures or inquiry regarding any matter which may or may not be known to Seller or any of the other Seller Parties, and Purchaser, for itself and for its successors and assigns, hereby expressly waives and releases Seller and each of the other Seller Parties from any such duty that otherwise might exist. Any reports, repairs or work required by Purchaser are the sole responsibility of Purchaser, and Purchaser agrees that there is no obligation on the part of Seller to make any changes, alterations or repairs to the Premises or to cure any violations of law or to comply with the requirements of any insurer.

**Section 6.03.** Except as expressly provided herein below in this Section 6.03, Purchaser, for Purchaser and Purchaser's successors and assigns, hereby releases Seller and each of the other Seller Parties from, and waives all claims and liability against Seller and each of the other Seller Parties for or attributable to, the following:

> (i)     any and all statements or opinions heretofore or hereafter made, or information furnished, by the Seller Parties to Purchaser or any of Purchaser's Representatives (as defined in Section 6.04); and

> (ii)    any and all losses, costs, claims, liabilities, expenses, demands or obligations or any kind or nature whatsoever attributable to the Premises, whether arising or accruing before, on or after the Closing Date and whether attributable to events or circumstances which have heretofore or may hereafter occur, including, without limitation, (A) all losses, costs, claims, liabilities, expenses, demands and obligations with respect to the structural, physical, or environmental condition of the Premises and (B) all losses, costs, claims, liabilities, expenses, demands and obligations

relating to the release of or the presence, discovery or removal of any hazardous materials in, at, about or under the Premises, or for, connected with or arising out of any and all claims or causes of action based upon CERCLA (Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§9601 *et seq.*, as amended by SARA (Superfund Amendment and Reauthorization Act of 1986) and as may be further amended from time to time), the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§6901 *et seq.*, or any related claims or causes of action or any other federal, state or municipal based statutory or regulatory causes of action for environmental contamination at, in, about or under the Premises;

The release and waiver set forth in this Section 6.03 is not intended and shall not be construed to affect or impair any rights or remedies that Purchaser may have against Seller pursuant to this Contract as a result of a breach of any of Seller's Warranties or breach of any other provision of this Contract. Purchaser acknowledges and agrees that the provisions of this Section 6.03 were a material factor in Seller's acceptance of the Purchase Price and, while Seller has provided the Documents and cooperated with Purchaser, Seller is unwilling to sell the Premises unless Seller and the other Seller Parties are expressly released as set forth in Section 6.03.

**Section 6.04.** For purposes of this Section 6, each of the following terms shall have the meaning set forth below.

"Purchaser's Representatives" shall mean Purchaser, its partners, and members and any officers, directors, employees, agents, representatives and attorneys of Purchaser, its partners or members.

"Documents" shall mean the documents and instruments applicable to the Premises or any portion thereof that Seller or any of the other Seller Parties deliver or make available to Purchaser prior to Closing or otherwise allow Purchaser access to prior to Closing.

"Due Diligence" shall mean examinations, inspections, investigations, tests, studies, analyses, appraisals, evaluations and/or investigations with respect to the Premises, the Documents, and other information and documents regarding the Premises, including, without limitation, examination and review of title matters, applicable land use and zoning Laws and other laws applicable to the Premises, the physical condition of the Premises, and economic status of the Premises.

"Hazardous Materials" shall mean any substance, chemical, waste or material that is or becomes regulated by any federal, state or local government authority because of its toxicity, infectiousness, radioactivity, explosiveness, ignitability, corrosiveness or reactivity, including, without limitation, asbestos or any substance containing more than 0.1 percent asbestos, the group of compounds known as polychlorinated biphenyls, flammable explosives, oil, petroleum or any refined petroleum product.

"Seller Parties" shall mean and include, collectively, (a) Seller; (b) its counsel; (c) broker; (d) Seller's property manager, (e) any direct or indirect equity owner, officer, director, employee, or agent of Seller, its counsel, broker or Seller's property manager; and (f) any other entity or individual affiliated or related in any way to any of the foregoing.

"Seller's Warranties" shall mean Seller's representations and warranties set forth in Section 4 of this Contract.

**Section 6.05.** The terms of this Section 6 are intended to survive the Closing or earlier termination or expiration of this Contract.

## SECTION 7.  SELLER'S OBLIGATIONS AS TO LEASES

**Section 7.01.** Between the date of this Contract and the Closing, Seller shall operate the Premises as conducted prior to the date hereof and shall not, without Purchaser's prior written consent, which consent may be withheld by Purchaser in its sole and absolute discretion, for any reason or for no reason: (a) amend any Lease in any respect (unless required by law), or (b) terminate any Lease, except by reason of a default by the tenant thereunder.  The foregoing obligation of Seller in this Section 7.01 shall apply only to the rental units set forth in the annexed Schedule "D".

**Section 7.02.** Between the date of this Contract and the Closing, Seller shall not permit occupancy of, or enter into any new lease for, space in the Building which is presently vacant or which may hereafter become vacant, or renew or extend any existing Lease (unless required by law).

**Section 7.03.** If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Seller in violation of any restrictions contained in this Contract.

**Section 7.04.** Seller does not warrant that any particular Lease will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder.  The termination of any Lease prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this Contract in any manner or entitle Purchaser to an abatement of or credit against Purchase Price or give rise to any other claim on the part of Purchaser.

**Section 7.05** Seller hereby assigns all security deposits and any sums of money held in escrow on behalf of any Tenant of the Property to Purchaser.

## SECTION 8.  RESPONSIBILITY FOR VIOLATIONS

**Section 8.01.** All notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued prior to or after the date of this Contract by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises and all liens which have attached to the Premises prior to the Closing pursuant to the Administrative Code of the City of New York, if applicable, shall not be required to be removed nor complied with by Seller and shall not be an objection to title, provided however:

(a)     Purchaser assumes no responsibility for criminal violations, if any, and Seller shall remain liable for the discharge, prior to Closing, of any such violations;

(b)    the cost and expense of discharging liens which have attached to the Premises prior to the Closing pursuant to the Administrative Code, if any, shall be borne by Seller and deducted from the balance of the Purchase Price payable at Closing; and

(c)    the cost and expense of discharging liens which attach to the Premises and are as of record as a consequence of emergency repairs by New York City prior to the Closing shall be borne by Seller and deducted from the balance of the Purchase Price payable at Closing.

Section 8.02.   If the reasonably estimated aggregate cost to discharge liens which Seller is required to remove shall exceed $600,000 for any and all of the properties comprising the Premises (which sum shall include any sum expended by Seller under Section 14.02 hereof), Seller shall have the right to cancel this Contract, in which event the sole liability of Seller shall be as set forth in Section 14.02 unless Purchaser elects to accept title to the Premises subject to all such liens, in which event Purchaser shall be entitled to a credit of an amount equal to $600,000 against the monies payable at the Closing. Notwithstanding anything to the contrary in this Section 8.02, Seller, at or prior to Closing shall remove all voluntary and consensual liens from the record.

Section 8.03.   Any violations which a tenant is required to remove or comply with pursuant to the terms of its lease by reason of such tenant's use or occupancy shall not be an objection to title hereunder and Seller shall have no responsibility under this Section in respect thereto. Purchaser shall accept the Premises subject to all such violations without any abatement of or credit against the Purchase Price.

Section 8.04.   If required, Seller, upon written request by Purchaser, shall promptly furnish Purchaser with written authorization to make any necessary searches for the purpose of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

## SECTION 9.  DESTRUCTION, DAMAGE OR CONDEMNATION

Section 9.01.   The provisions of Section 5-1311 of the General Obligations Law shall not apply to the sale and purchase of the Premises provided for in this Contract.

Section 9.02.   Simultaneously with the execution of this Contract, Mordechai Muschel shall deposit in escrow with Snitow Kanfer Holtzer & Millus, LLP, (the "Escrow Agent") the following: (i) a security agreement granting Purchaser a security interest in Rachel Muschel's shares in a Yellow Shutters Owners Corp. (the "Muschel Co-op") (the "Security Agreement"), (ii) a note and mortgage in the amount of $200,000 (collectively, the "Mortgage") (iii) an affirmation of confession of judgment (the "Affirmation"), (iv) an assignment of the Proprietary Lease of the Muschel Co-op ("Assignment") and a Stock Power authorizing the transfer of Rachel Muschel's shares in the Muschel Co-op ("Stock Power") and (v) a Guaranty executed by Mordechai Muschel and Rachel Muschel guaranteeing payment of the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, to Purchaser and guaranteeing payment of $850,000, which represents the Barnett Loan and interest accrued thereon as well as attorneys' fees incurred in collecting the Barnett Loan (the "Default Payment") to Purchaser (the "Guaranty"). If by reason of fire or other casualty, Purchaser determines that the Property shall be damaged or

destroyed so that it shall require repairs which exceed $750,000, Purchaser shall have the right either (a) to terminate this Contract, in which event this Contract shall be null and void and of no further force and effect and neither party shall have any further claims against the other party, except that Seller shall return the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, to Purchaser and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing, or (b) have this Contract continue in full force and effect, in which event Purchaser shall have no right to a reduction in the Purchase Price. However, Seller agrees to assign to Purchaser any right, title and interest Seller may have in and to insurance policy(s) and proceeds relating to such fire or casualty and to pay Purchaser the amount of any deductible with respect to such insurance. If the Premises are damaged by fire but the amount necessary to repair the Premises is not in excess of $750,000, the Closing shall proceed as scheduled herein and Seller shall assign to Purchaser the proceeds of any casualty insurance and pay to Purchaser the amount of any deductible with respect to such insurance and Seller shall not have any responsibility for the restoration or repair of the Premises. In the event the proceeds of any casualty insurance is insufficient to fully repair the damage, Purchaser shall have the right to terminate this Contract, in which event this Contract shall be null and void and of no further force and effect and neither party shall have any further claims against the other party, except that Seller shall return the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, to Purchaser and Escrow Agent shall shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing. . In the event of termination by Purchaser under this Section 9.02 or in the event of termination of this Contract under any other provision of this Contract, the forgiveness of the loan described in Section 2.01(b) shall be null and void, the loan shall automatically be reinstated in the amount of $850,000, and Seller shall return the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereonto Purchaser and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense,

against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing.

**Section 9.03.** (a) In the event of a condemnation, partial or complete, temporary (except as hereinafter provided) or otherwise, the effect of which will be to (i) reduce the rent collectable on the date of taking from the leasing of space in the Building by more than twenty (20%) or (ii) cause the existing improvements on the premises not to be in compliance with applicable zoning laws and regulations, Seller shall give notice thereof to Purchaser and Purchaser shall have thirty (30) days to elect to terminate this Contract. The receipt by Seller of a notice of pending or threatened taking shall constitute an event of condemnation for purposes of this Contract. If Purchaser elects to terminate, neither party shall have any further obligation to the other, except that Seller shall return the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, to Purchaser and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a hard money lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Section 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing. All proceeds of a condemnation or taking shall belong to Seller and Purchaser shall have no claim with respect thereto, except if Purchaser elects not to terminate this Contract, in which event all conditions of the Closing shall be deemed waived with respect to the portion taken, Seller shall deliver an assignment of the condemnation award for the portion taken and the Purchase Price will be immediately paid to Seller as if the Closing had occurred for the portion taken. All of the terms and conditions of this Contract for the balance of the Premises shall continue in full force and effect.

(b) A temporary taking which, by its terms, shall be terminated before Closing (or the reasonable projection thereof) shall not give rise to the option to terminate this Contract.

## SECTION 10.    COVENANTS OF SELLER

Seller covenants that between the date of this Contract and the Closing:

**Section 10.01.** From the date hereof until the date of Closing, Seller shall not withdraw or apply any security deposit unless the tenant has vacated the demised premises.

**Section 10.02.** Seller shall not modify or amend any Service Contract or enter into any new service contract unless the same is terminable without penalty by the then owner of the Premises upon not more than thirty days' notice.

**Section 10.03.** Seller or anyone acting on its behalf shall not enter into any contract or agreement (including, but not limited to any option agreement) to sell or lease all or any part of the Premises to any other person or entity.

**Section 10.04.** No fixtures, equipment or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

**Section 10.05.** Between the date hereof and the Closing Date Seller shall, for the sole purpose of facilitating the transfer of ownership of the Premises following the Closing, allow Purchaser or Purchaser's Representatives access to the Premises upon reasonable prior notice at reasonable times provided (a) such access does not interfere with the operation of the Premises or the rights of tenants; (b) Purchaser shall not contact any tenant without Seller's prior written consent; and (c) Purchaser shall not be permitted to perform any further testing or other physical evaluation of the Premises prior to Closing. Prior to such time as Purchaser or any of Purchaser's Representatives enter the Premises, Purchaser shall (i) obtain policies of general liability insurance which insure Purchaser, its agents and representatives with liability insurance limits of not less than $1,000,000 combined single limit for personal injury and property damage and name Seller and Seller's property manager as additional insureds and which are with such insurance companies, provide such coverage and carry such other limits as Seller shall reasonably require, and (ii) provide Seller with certificates of insurance evidencing that Purchaser has obtained the aforementioned policies of insurance.

**Section 10.06.** Seller shall not hire any additional or replacement employees, unless it is essential to the maintenance of the Premises. Seller represents and warrants to Purchaser that the Premises is not a union Premises, that no employee has an employment contract, and that no employees have unionized or attempted to unionize.

**Section 10.07.** Seller shall give Purchaser written notice of any action or proceeding that is commenced with respect to the Premises other than any action started in the ordinary course of business to collect rent or any action covered by Seller's existing liability insurance.

**Section 10.08.** Seller shall keep and maintain in force and effect all current insurance on the Premises.

**Section 10.09.** Seller shall use best efforts to obtain an estoppel certificate from tenants 736 Broadway Jewelry, Inc., Alfonso Rufolo and Foot Locker in the form attached hereto as Schedule "E". In the event Seller is unable to obtain said estoppel certificate, Mordechai Muschel shall provide an Owner's certificate attesting to the same facts as provided for in the estoppel certificate and shall personally guarantee payment to Purchaser for any damages resulting from any misrepresentation in the Owner's certificate provided that Purchaser has notified Seller of the misrepresentation within seven months of the Closing Date.

**Section 10.10.** Seller shall not enter into any new Lease or extend the term of any existing Lease with any person or entity for any part of the Premises. The foregoing covenant of Seller in this Section 10.10 shall apply only to the rental units set forth in the annexed Schedule "D".

## SECTION 11.    SELLER'S CLOSING OBLIGATIONS

At the Closing, Seller shall deliver the following to Purchaser:

**Section 11.01.** A statutory form of bargain and sale deed with covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this Contract. Seller may omit from the deed the recital of any or all of the "subject to" clauses herein contained and/or any other title exceptions, defects or objections which have been waived or consented to by Purchaser, but the same shall nevertheless survive the Closing.

**Section 11.02.** Originals of all Leases (to the extent available) initialed by Purchaser and all others in Seller's possession.

**Section 11.03.** A schedule of all cash security deposits held by Seller on the Closing Date and a credit to Purchaser in the amount of such security deposits in Seller's possession. Purchaser shall and agrees to defend, indemnify and hold Seller harmless from and against any loss, cost, damage or expense arising out of or in connection with the Security Deposits.

**Section 11.04.** A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

**Section 11.05.** Purposely Omitted.

**Section 11.06.** An assignment to Purchaser, without recourse or warranty, of all of the interest of Seller in those Service Contracts, warranties, licenses, certificates, permits and other authorizations and approvals relating to the ownership or operation of the Premises which are then in effect and are assignable by Seller and copies of all such documents.

**Section 11.07.** To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

**Section 11.08.** Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, charges, liens, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name and an affidavit that no work has been done on the Premises by the City of New York or any local municipality and that there has been no demand that any work be performed which would result in charges being levied by the New York City Department of Emergency Repairs.

**Section 11.09.** Checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by Purchaser's title company, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof.

**Section 11.10.** To the extent they are then in Seller's possession, copies of current painting records. Seller shall make all other Building and tenant files and records available to Purchaser for copying, which obligation shall survive the Closing.

**Section 11.11.** An original letter, executed by Seller or by its agent, advising the tenants of the sale of the Premises and directing that rents and other payments thereafter be sent to Purchaser or as Purchaser may direct.

**Section 11.12.** Such proof of Seller's right, power and authority to sell the Premises to Purchaser on the terms and conditions of this Contract as the Title Company shall reasonably require.

**Section 11.13.** A certification that Seller is not a "foreign person" as such term is used in Section 1445 of the Internal Revenue Code properly completed in the form required to satisfy Internal Revenue Service requirements to relieve Purchaser of any withholding requirement.

**Section 11.14.** A bill of sale conveying to Purchaser all the Personal Property owned by Seller, free and clear of all liens and encumbrances.

**Section 11.15.** An assignment to Purchaser, without recourse or warranty, of all of the interest of Seller in the Leases, provided Purchaser shall agree to assume all of lessor's interest under each Lease from the date of Closing and shall indemnify Seller against any loss or liability (including, without limitation, reasonable attorney's fees and disbursements) which arises out of Purchaser's failure to perform its obligations as lessor under any Lease after the date of the Closing. In the event Seller fails to deliver estoppel certificates in accordance with Seller's obligation set forth in Section 10.09 above, and Purchaser elects to proceed to Closing, Seller shall indemnify Purchaser against any loss or liability (including, without limitation, reasonable attorneys' fees and disbursements) which arises out of Seller's failure to perform its obligations as lessor under any Lease prior to the date of the Closing.

**Section 11.16.** Possession of the Premises in the condition required by this Contract, subject to the Leases and statutory tenancies, if any, and keys therefor.

**Section 11.17.** Intentionally omitted.

**Section 11.18.** Any other documents required by this Contract to be delivered by Seller or which may be reasonably required to satisfy Seller's obligations under this Contract.

**Section 11.19** At Closing, Seller shall execute and deliver "bring down" certificates to the effect that all representations and warranties made in this Agreement, including those set forth in Section 4 above, remain true and correct in all respects with the same effect as if then made.

# SECTION 12.    PURCHASER'S CLOSING OBLIGATIONS

At the Closing, Purchaser shall:

**Section 12.01.** Deliver to Seller payment of the portion of the Purchase Price payable at the Closing in accordance with Section 2.02 hereof, as adjusted for apportionments under Section 13 hereof.

**Section 12.02.** Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under Section 11.03.

**Section 12.03.** Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause all such returns and Seller's checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

**Section 12.04.** Deliver any other documents required by this Contract to be delivered by Purchaser.

**Section 12.05** At Closing, Purchaser shall execute and deliver "bring down" certificates to the effect that all representations and warranties made in this Agreement, including those set forth in Section 5 above, remain true and correct in all respects with the same effect as if then made.

**Section 12.06** At Closing, Purchaser shall deliver a Stipulation of Discontinuance for the action with prejudice titled Gary Barnett v. Mordechai Muschel, Index No. 601823/2009 executed by counsel for the Plaintiff (Sup. Ct., New York Co.) and releasing any further personal claims against Mordechai Muschel not pertaining to this Contract.

# SECTION 13.    APPORTIONMENTS AT THE CLOSING

**Section 13.01.** The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a)    prepaid rents except with regard to the third floor tenant at 736 Broadway which Purchaser hereby waives;

(b)    real estate taxes, water charges, sewer rents and vault charges, if any, on the basis of the fiscal period for which assessed. Seller shall not be responsible to pay or adjust for water and sewer charges due by any commercial tenant. If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed;

(c)    prepaid or accrued employee obligations, including but not limited to withholding, social security, unemployment, wages, health benefits and vacation pay, of

all persons employed at the Premises whose employment was not terminated at or prior to the Closing;

(d)     value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes on the basis of an actual reading to be furnished by Seller's supplier within three days prior to the Closing;

(e)     charges under transferable Service Contracts or permitted renewals or replacements thereof which Purchaser opts to assume (Purchaser hereby agrees to assume such Service Contracts described on Schedule "I" as are not cancelable by Seller upon thirty (30) days prior to written notice);

(f)     permitted administrative charges, if any, on tenants' security deposits;

(g)     Reletting Expenses under Section 7.02, if any;

(h)     periodically recurring governmental fees for transferable licenses or permits issued in respect of the Premises for the use of any part thereof, if assignable and to the extent assigned;

(i)     dues to rent stabilization associations, if any;

(j)     any other customary adjustments made in connection with the sale of similar type buildings.

Except as otherwise expressly provided in this Contract, the customs of The Real Estate Board of New York, Inc. with respect to title closings, in effect as of the date hereof, shall apply to the apportionments and other matters herein mentioned.    In the event any adjustments are miscalculated at the Closing, such error shall be promptly corrected after the Closing.    The provisions of this Section shall survive the Closing for a period of three (3) months.

**Section 13.02.** If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority: (a) first to the month in which the Closing occurred; (b) then to any month or months following the month in which the Closing occurred; and (c) then to the period prior to the month in which the Closing occurred.  If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other party, which obligation shall survive the Closing.

**Section 13.02**  Seller hereby directs that at Closing, Purchaser shall pay $2,161,011 of the Purchase Price to the Beth Din Tzedek of America – Ein Moshe.

## SECTION 14.    OBJECTIONS TO TITLE AND FAILURE OF SELLER TO PERFORM

**Section 14.01.**  Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney within twenty (20) days after the date hereof.  Purchaser shall cause a copy of all title updates to be forwarded to Seller's

attorney upon receipt. Purchaser further agrees that it will within ten (10) days after its receipt of the title report advise Seller's attorneys in writing of any exceptions to title to the Premises not set forth in Section 1.02 above as to which Purchaser believes it is not required to take title "subject to." Seller shall be entitled to a reasonable adjournment or adjournments of the Closing for up to 60 days to remove any defects in or objections to title noted in such title report or title update and any other defects or objections which may be disclosed on or prior to the Closing Date. Any action taken by Seller to remove such objections shall not be deemed an admission on Seller's part that such objection is one which would give Purchaser the right to terminate this Contract. Any exception appearing in a title report or any continuation thereof which is not objected to by Purchaser prior to the Closing Date, as provided herein, shall be deemed waived, unless such exception first appears in a title continuation delivered by the title company at the Closing.

**Section 14.02.** If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this Contract, Purchaser nevertheless, may elect to accept such title as Seller may be able to convey without any other credit or liability on the part of Seller. If Purchaser shall not so elect, Seller may terminate this Contract and refund the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest accrued thereon to Purchaser. Upon such refund and reimbursement, this Contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability, other than any arising under Section 19 hereof except that Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a hard money lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing . Seller shall not be required to bring any action or proceeding or to incur any expense in excess of $600,000 in respect of any and all properties comprising the Premises (which sum shall include any sum expended by Seller under Section 8 hereof) to cure any title defect or to enable Seller otherwise to comply with the provisions of this Contract, but the foregoing shall not permit Seller to refuse to pay off at the Closing, to the extent of the monies payable at the Closing, mortgages on the Premises, of which Seller has actual knowledge, which are not being assumed by Purchaser.

**Section 14.03.** Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than three days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any such liens and encumbrances of record. Upon request made a reasonable time

before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with Section 2.02. If Purchaser's title insurance company is willing to insure Purchaser that such charges, liens and encumbrances will not be collected out of or enforced against the Premises and omit same from Purchaser's lender's title policy, then Seller shall have the right in lieu of payment and discharge to deposit with the title insurance company such funds or assurances or to pay such special or additional premiums as the title insurance company may require in order to so insure and omit. In such case, the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

## SECTION 15.    TAX REDUCTION PROCEEDINGS

**Section 15.01.** If Seller has heretofore filed applications for the reduction of the assessed valuation of the Premises and/or instituted certiorari proceedings to review such assessed valuations for any prior tax years, Purchaser acknowledges and agrees that Seller shall have sole control of such proceedings, including the right to withdraw, compromise and/or settle the same or cause the same to be brought on for trial and to take, conduct, withdraw and/or settle appeals, and Purchaser hereby consents to such actions as Seller may take herein. Seller shall not withdraw, compromise or settle any such proceedings for any fiscal period in which the Closing is to occur without the prior written consent of Purchaser, which consent shall not be unreasonably withheld. Any refund or the savings for any year or years prior to the tax year in which the Closing herein occurs shall belong solely to Seller. Any tax savings or refund for the tax year in which the closing occurs shall be prorated between Seller and Purchaser after proportionate deduction of attorneys' fees and other expenses related to the proceeding. Each party hereto shall execute all consents, receipts, instruments and documents which may reasonably be requested by the other party in order to facilitate settling the above proceedings and collecting the amount of any refund or tax savings. Seller, at Purchaser's sole expense, shall cooperate with Purchaser to file any new tax certiorari proceedings. The provisions of this Section 15 shall survive the Closing.

## SECTION 16.    DEFAULT

**Section 16.01.** If Purchaser shall default in the payment of the Purchase Price on the Closing Date, Seller may terminate this Contract. Purchaser acknowledges that if Purchaser shall so default under this Contract, Seller will suffer substantial adverse financial consequences as a result thereof. Accordingly, Seller, as its sole remedy, shall have the right to retain the Contract Deposit and accrued interest on such amount and the Barnett Loan shall be deemed satisfied and paid by Mordechai Muschel as and for liquidated damages, it being agreed that Seller's damages will be difficult, if not impossible, to ascertain, in which event, after the delivery of the balance of the Contract Deposit, including any additional sums paid pursuant to Section 3.01 of this Contract, to Purchaser, Purchaser and Seller shall have no further rights or obligations under this Contract, except those expressly provided herein to survive the termination of this Contract. Seller shall have no obligation on its part to tender a deed for the Premises to Purchaser prior to pursuing any of the remedies available to Seller set forth above.

**Section 16.02.** If Seller shall default hereunder for any reason, Purchaser, as its remedy, shall either have the right (a) in lieu of prosecuting an action for damages or proceeding with any other legal or equitable course of conduct, including, without limitation, any action for

specific performance, to terminate this Contract whereupon Seller shall return to Purchaser the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a hard money lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing.. Upon receipt of the foregoing by Purchaser, Purchaser and Seller shall have no further rights or obligations under this Contract, except those expressly provided herein to survive the termination of this Contract, or (b) in lieu of prosecuting an action for damages or proceeding with any other legal or equitable course of conduct, to seek specific performance of this Contract. In the event Purchaser prosecutes an action or proceeding for specific performance and such action of proceeding results in a judgment in favor of Purchaser, Seller shall indemnify and reimburse Purchaser for Purchaser's reasonable counsel fees (including disbursements, penalties and interest accrued) and all other actual expenses resulting from or made necessary by the bringing of such action or proceeding. In the event Purchaser prosecutes an action or proceeding for specific performance and such action of proceeding results in a judgment in favor of Seller, Purchaser shall indemnify and reimburse Seller for Seller's reasonable counsel fees (including disbursements, penalties and interest accrued) and all other actual expenses resulting from or made necessary by the bringing of such action or proceeding. Notwithstanding anything in this Contract to the contrary, in the event of default by Seller for any reason, Purchaser shall have the right to receive the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, together with any interest earned thereon, and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a hard money lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing .


### SECTION 17.  LIMITATIONS ON SURVIVAL OF REPRESENTA-TIONS, WARRANTIES, COVENANTS AND OTHER OBLIGATIONS

**Section 17.01.** Except as otherwise provided in this Contract, no representations, warranties, covenants or other obligations of Seller set forth in this Contract shall survive the

Closing, and no action based thereon shall be commenced after the Closing. Seller shall not have any liability if a representation or warranty contained herein is untrue, inaccurate or incorrect to the extent that this Contract, any documents delivered to Purchaser in connection herewith, Purchaser's own due diligence investigations or any estoppel certificate executed by any tenant of the Premises and delivered to Purchaser or any of Purchaser's Representatives contains information which is inconsistent with such representation or warranty.

**Section 17.02.** The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this Contract to survive the Closing.

### SECTION 18. PURPOSELY OMITTED

### SECTION 19. BROKER

**Section 19.01.** Seller and Purchaser mutually represent and warrant that there is no broker with whom they have dealt in connection with this Contract other than Moshe Majeski (the "Broker") and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to claim a commission in connection with this transaction. Seller and Purchaser shall pay the Broker at closing subject to separate agreements. Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representations, warranties or agreements contained in this Section. The representations and obligations under this Section shall survive the Closing or, if the Closing does not occur, the termination of this Contract.

### SECTION 20. NOTICES

**Section 20.01.** All demands, requests or other communications (collectively, "Notices") required to be given or which may be given hereunder shall be in writing and shall be sent by (a) certified or registered mail, return receipt requested, postage prepaid, or (b) national prepaid overnight delivery service, or (c) personal delivery with receipt acknowledged in writing, or (d) if not relating to default, termination or distribution of monies, by telecopier with confirmation of receipt, directed to:

If to Seller:         c\o Mordechai Muschel
                      108 Lafayette Avenue, Passaic, New Jersey
                      07055

with a copy to:                    Yaron Kornblum, Esq.
Rivkin Radler LLP
926 RexCorp Plaza
Uniondale, New York 11556-0111
Telephone No.: (516) 357-3082
Facsimile No: (516) 357-3333
yaron.kornblum@rivkin.com

If to Purchaser:             Extell Development Company
805 Third Avenue
New York, New York 10022

with a copy to:                    Franklyn H. Snitow , Esq.
Snitow Kanfer Holtzer & Millus LLP
575 Lexington Avenue
New York, NY 10022-6102
Phone (212) 317-8500
Fax (212) 317-1308

Any notice so sent by certified or registered mail shall be deemed given two days after mailing. All other notices shall be deemed given when actually received or refused by the party to whom the same is directed. A notice may be given by a party or by such party's attorney. Both Seller and Purchaser may designate, by not less than five (5) business days notice given to the other in accordance with the terms of this Section 20, substituted parties to whom, and/or addresses to which, notices should be sent hereunder. All notices necessary or required under this Contract may be sent by facsimile or electronic mail.

### SECTION 21.        INTENTIONALLY DELETED

### SECTION 22.        ASSIGNMENT

**Section 22.01.** Neither the Purchaser's interest under this Contract nor any portion thereof may be assigned by Purchaser, except with Seller's prior written consent, which consent Seller may arbitrarily or unreasonably withheld or delayed. Any attempt at such assignment without first obtaining such consent shall be null and void and of no force and effect and shall be deemed to be a material breach of this Contract by Purchaser. Notwithstanding anything to the contrary in this paragraph, Purchaser, upon notice to Seller, shall be permitted to assign this Contract to an LLC in which Gary Barnett has a twenty five (25%) percent ownership and controlling interest. Any permitted assignment of this Contract by Purchaser shall not relieve Purchaser from any of its liabilities under this Contract.

### SECTION 23.        PURPOSELY OMITTED

**SECTION 24.**     **PURPOSELY OMITTED**

**SECTION 25.**     **MISCELLANEOUS**

**Section 25.01.** Purchaser shall not record this Contract and any attempt to record the same shall be a material default by Purchaser thereunder and thereupon, at the option of Seller, this Contract shall be deemed cancelled and Seller shall have any and all remedies for a default by Purchaser as provided herein or by law.

**Section 25.02.** Whether or not the transactions contemplated under this Contract are consummated, each party hereto shall pay its own expenses incident to the preparation and performance of this Contract including, without limitation, attorneys' fees, consultant's fees, etc.

**Section 25.03.** Each party hereby acknowledges that it has been represented by counsel of its own choosing.

**Section 25.04.** If the superintendent or any other employee of the seller occupies an apartment and/or other space for living quarters in the basement or ground floor of the aforesaid premises and such use and occupancy of such apartment or such other space violates any law, ordinance, rule and/or regulation of any municipal, state or other governmental department, authority, commission, agency or board, such use and occupancy shall not be deemed such a violation which has to be removed by the seller pursuant to the terms of this contract, nor shall such use or occupancy be any objection to title and the purchaser agrees to take title subject to such use and occupancy. At closing, Seller shall provide Purchaser with a letter terminating the superintendant.

**Section 25.05.** The Purchaser agrees that no allowance shall be made to it because of the fact that the refrigerators and/or gas ranges are the property of the tenants in the building, even though the registrations for the said apartment may state that the refrigerators and/or gas ranges are services to be supplied by the owner of the building. .

**Section 25.06.** At the closing, Seller shall receive all real estate tax credits for senior citizens for the period for which Seller remains entitled. Any portion of such real estate tax adjustments which Seller has not received fully at the time of the closing shall be computed at the time of closing, and the Seller shall receive a credit for the amount that Seller is entitled to for this item.

**Section 25.07.** Purchaser hereby waives the right to have a risk assessment or inspection for lead-based paint and/or lead-based paint hazards and agrees to take the Premises "as is" with respect to lead-based paint and/or lead-based paint hazards.

**Section 25.08.** In the event that either Purchaser or Seller commences any action or proceeding with respect to this Contract or the rights of the parties thereunder, the prevailing party shall be entitled to recover from the other party, the reasonable attorney's fees and disbursements incurred by such prevailing party. The provisions of this paragraph 25.08 shall survive the Closing or the earlier termination of this Contract

**Section 25.09.** This Contract, being drawn, negotiated and executed in the State of New York, pertaining solely to property situated in the State of New York, shall be interpreted and governed by the laws of the State of New York, without regard to the choice of law provisions of such State.

**Section 25.10.** EACH PARTY HERETO HEREBY KNOWINGLY, IRREVOCABLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED ON THIS CONTRACT, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS CONTRACT OR THE TRANSACTIONS CONTEMPLATED HEREIN, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH PARTY TO ACCEPT THIS CONTRACT. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS CONTRACT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS CONTRACT, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS CONTRACT, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS CONTRACT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**Section 25.11.** The provisions of this Contract are intended to be solely for the benefit of the parties hereto, and the execution and delivery of this Contract shall not be deemed to confer any rights upon, nor obligate any of the parties hereunder, to any person or entity other than the parties hereto.

**Section 25.12.** This Contract is not an offer by either party, and it shall not have any binding effect unless and until Purchaser and Seller shall have both executed same and fully executed copies thereof have been delivered to Seller and Purchaser, or their respective attorneys.

**Section 25.13.** This Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract.

**Section 25.14.** No failure or delay of either party in the exercise of any right given to such party hereunder or the waiver by any party of any condition hereunder for its benefit (unless the time specified herein for exercise of such right, or satisfaction of such condition, has expired) shall constitute a waiver of any other or further right, nor shall any single or partial exercise of any right preclude other or further exercise thereof. The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

**Section 25.15.** This Contract may not be changed or terminated orally or in any manner, other than by written agreement executed by Seller and Purchaser or their attorneys.

**Section 25.16.** Subject to the provisions of Section 22 hereof, the provisions of this Contract shall extend, bind and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns.

**Section 25.17.** If any provision of this Contract as applied to either party or to any circumstance shall be adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, the same shall in no way affect, to the maximum extent permitted by law, any other provisions of this Contract, the application of any such other provision under circumstances different from those adjudicated by the court, or the validity or enforceability of this Contract as a whole.

**Section 25.18.** This Contract may be executed in any number of counterparts, each of which shall be an original with the same force and effect as if the signature thereto and hereto were upon the same instrument. Signatures transmitted by fax or electronic mail shall be valid and binding.

**Section 25.19.** As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the case may require.

**Section 25.20.** The captions of this Contract are inserted for convenience of reference and in no way define, describe or limit the scope or intent of this Contract or any of the provisions hereof.

**Section 25.21.** All Schedules attached to this Contract are incorporated into this Contract by reference as if fully set forth herein.

**Section 25.22.** This Contract shall be construed without regard to or aid of canons requiring construction against the party drawing this Contract.

**Section 25.23** Mordechai Muschel's personal liability shall be limited to Sections 4.06 and 19.01 of this Contract. Nothing provided for herein shall be construed to limit Seller's obligations as provided for in this Contract.

## SECTION 26.        SECTION 1031 TAX FREE EXCHANGE

Seller has informed Purchaser that it shall seek in full or partial payment of the Purchase Price like-kind property for the purpose of effectuating an exchange pursuant to Section 1031 of the Internal Revenue Code, and the regulations promulgated thereunder. To facilitate such exchange, and as a material inducement to Seller to enter into this Contract and at no cost, expense or liability to Purchasers, Purchaser consents (i) to an assignment by Seller of this Contract or of any of Seller's rights hereunder, including the right to receive all or any portion of the Purchase Price, to a Qualified Intermediary (as defined in

Treasury Regulations Section 1.1031(k)-1(g)(4)) and (ii) to take such other actions as are reasonably necessary to facilitate such like-kind exchange, which shall in no event involve Purchaser acquiring title to or owning any replacement property on behalf of the Seller or incurring any expenses or liability (unless such expenses or liability are reimbursed to Purchaser by Seller). Purchaser agrees to reasonably cooperate with Seller in effectuating the like-kind exchange and to execute all documents reasonably necessary in connection therewith. In the event of a like-kind exchange, on the Closing Date, at the direction of the Qualified Intermediary (a) Seller shall convey title to the Premises to Purchaser, (b) Purchaser shall pay the balance of the Purchase Price (or the portion so assigned) to the Qualified Intermediary or its designee, and (c) Purchaser shall execute such documents as may be reasonably necessary to acknowledge the exchange. The Qualified Intermediary shall have the right to direct the payment of the balance of the Purchase Price to separate accounts and/or different persons and Purchaser agrees to comply with such direction from the Qualified Intermediary. Seller agrees to indemnify and hold purchaser free and harmless from any cost, expense or liability, including reasonable attorney's fees, resulting from Seller's participation in such exchange.

(b)     Purchaser reserves the right to include this transaction as part of an IRC Section 1031 tax deferred exchange for the benefit of Purchaser, at no cost, expenses or liability to Seller. Seller agrees to execute any and all documents (subject to the reasonable approval of Seller's counsel) as are reasonably necessary in connection therewith, provided that the close of escrow for the conveyance of Seller's property shall not be contingent upon or subject to the completion of such exchange, Purchaser agrees to indemnify and hold Seller free and harmless from any cost, expense or liability, including reasonable attorney's fees, resulting from Seller's participation in such exchange.

Section 27          **DISCONTINUANCE OF BANKRUPTCY ACTION**

This Contract shall be submitted to the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") for its approval of (a) this Contract and (b) the stipulation executed concurrently herewith and attached hereto as Schedule "G" providing for, among other things, (i) the dismissal of the Bram Will-El, LLC and William Muschel, LLC bankruptcy proceedings bearing Case Nos. 06-01788 and 06-01790, respectively, (ii) the dismissal, with prejudice, of the adversary proceedings pending in the United States Bankruptcy Court for the Southern District of New York entitled *Broadwall America, Inc. v. Bram Will-El, LLC and William Muschel, LLC* bearing Case Nos. 06-01788,06-01799 and 06-01790, and (iii) the waiver of any claim by Broadwall America, Inc to purchase the properties which are the subject of this Contract or any rights whatsoever under that certain contract between Broadwall America, Inc. and Bram Will-El, LLC and William Muschel, LLC, dated August 7, 2002. Nothing contained herein shall impair, prejudice or otherwise affect such rights, claims and defenses including such claims now asserted by Seller in a certain state court action entitled *Bram Wil-El LLC, et. al v. Extreme Realty, LLC, et. al, case no. 12667/07, Supreme Court of the State of New York, Kings County* none of which rights shall be impaired or affected under this Contract. Both parties shall fully cooperate in obtaining the aforementioned approval of the Bankruptcy Court. The aforesaid requirement that the Contract be approved by the Bankruptcy Court shall be deemed satisfied if the Bankruptcy Court so-orders the stipulation annexed as Schedule "G". In the event the Bankruptcy Court does not approve this Contract by issuing an

order or written communication indicating that it is refusing to approve this Contract, this Contract shall be null and void and of no further force and effect and neither party shall have any further claims against the other party, except that Seller shall return the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, to Purchaser and Escrow Agent shall release the Security Agreement, Mortgage, Affirmation, Assignment, Stock Power and Guaranty to Purchaser whereupon Purchaser shall be entitled to (i) record a UCC -1 Financing Statement against the Muschel Co-op (ii) record the Mortgage, at Seller's expense, against Mordechai Muschel's property located at 68 High Street, Passaic, New Jersey (iii) file the Affirmation in the Supreme Court of New York, New York County, and (iv) after thirty days (plus an additional sixty days in the event Seller provides a letter of commitment from a hard money lender that said lender shall lend Seller an amount equal to the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon, and the Default Payment) avail itself of all available remedies provided for in these instruments to collect the Contract Deposit, including any additional sums paid pursuant to Sections 3.01 of this Contract, and any interest earned thereon and the Default Payment which shall be due and owing

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the day and year first above written.

SELLERS:
Bram Will-El, LLC

_Mordechai Muschel_
Mordechai Muschel

SELLERS:
WILLIAM MUSCHEL, LLC

_Mordechai Muschel_
Mordechai Muschel

SELLERS:

_Mordechai Muschel_
MORDECHAI MUSCHEL

PURCHASER:

## SCHEDULE "A"

## LEGAL DESCRIPTION

# SCHEDULE "B'

## LITIGATION PENDING AGAINST SELLER

## SCHEDULE "C"

**RENT ROLL**

# SCHEDULE "D"

# SCHEDULE "E"

## FORM OF ESTOPPEL CERTIFICATE

# SCHEDULE "F"

## ASSUMED SERVICE CONTRACTS

## SCHEDULE "G"

## BANKRUPTCY STIPULATIONS